**BELLS BANKING COMPANY,**
**Plaintiff/Appellee.**

v.

**JACKSON CENTRE, INC.,**
**Defendant/Appellant.**

**JACKSON CENTRE, INC.,**
**Defendant/Third–Party**
**Plaintiff**

v.

**MODELINK CORPORATION, Robert**
**E. Roark and Bill Eady, Third–**
**Party Defendants.**

Court of Appeals of Tennessee,
Western Section, at Jackson.

Aug. 26, 1996.

Application for Permission to Appeal
Denied by Supreme Court
Jan. 6, 1997.

Thomas F. Taylor, Waldrop and Hall, P.A., Jackson, for Defendant/Third–Party Plaintiff/Appellant.

S. Jasper Taylor, Bells, for Plaintiff/Appellee.

FARMER, Judge.

This case comes before us for a determination of whether the trial court correctly adjudged the appellant, Jackson Centre, Inc. ("Jackson Centre" or "Corporation"), liable to the appellee, Bells Banking Company ("Bells Banking" or "Bank"), under a corporate guaranty agreement, executed by the then president and C.E.O. of the Corporation, Robert Roark. The agreement guarantees payment to the Bank of a line of credit (up to the principal amount of $120,000) extended to Modelink Corporation (Modelink), whose president was a Mr. B.G. Eady. A loan to Modelink in the principal amount of $80,175.38 is evidenced by a promissory note signed by Mr. Eady on behalf of Modelink, dated October 12, 1989. The guaranty also bears this date.

This lawsuit was initiated by Bells Banking against Jackson Centre on November 21, 1990 after Modelink defaulted on the note. It was alleged, *inter alia,* that Mr. Roark had the authority to bind the Corporation, as its president. Jackson Centre answered, denying any authority by Roark to enter into

the guaranty on its behalf and asserting that Roark "knowingly acted outside the scope of his authority in executing any documents [obligating the Corporation] to [the Bank] in any way...." Jackson Centre pursued a third party complaint against Modelink and Roark[1] for reimbursement and contribution in the event it was adjudged liable to Bells Banking.

After a bench trial, the following findings of fact were made:

> [Jackson Centre] was formed in 1988 for the purpose of purchasing, refurbishing, developing, leasing and managing real estate in downtown Jackson, Tennessee. [Roark] served as the President, Chief Executive Officer and, Chairman of the Board Of Directors of the corporation from its inception until 1990. The directors were Clark Shaw, Robert E. Roark, Lloyd Privett, Jean Smith and Gary Deaton.

> In 1989 Lloyd Privett came to [Bells Banking] and introduced [Roark], as the President and Chief Executive Officer of [Jackson Centre], to Ben Mehr, the Chief Executive Officer of the [Bank]. Lloyd Privett informed Mehr of the purpose of the corporation and that they would like to obtain financing from the bank to accomplish their goal.

> In October 1989, [Bells Banking] was approached by [Eady] President of [Modelink] and [Roark], who informed the bank that [Modelink] had been awarded a contract by [Jackson Centre] to provide engineering and architectural services to [Jackson Centre] and in turn [Modelink] would be paid the sum of $120,000.00 for the services and [Roark] produced letters between the two to evidence the contract. Roark and Eady requested the [Bank] to provide financing for [Modelink] to perform under the contract until payments were made by [Jackson Centre] to [Modelink] under the contract. The [Bank] required security for the loan and [Roark] agreed to sign a guaranty agreement on behalf of [Jackson Centre] guaranteeing payment of the indebtedness. [Roark] signed the guaranty agreement on October 12, 1989 and the loan was made to [Modelink].

> [Jackson Centre] in the period of January 1989 through October 1989 entered into other financing arrangements solely upon the signature of [Roark], as President. On January 3, 1989, [Jackson Centre] executed a Deed of Trust ... to secure an indebtedness of $160,000.00. [In] January, 1989, [Jackson Centre] executed a Deed of Trust in favor of Union Planters National Bank to secure an indebtedness of $50,000.00. On March 16, 1989 [Jackson Centre] executed a Deed of Trust ... to secure an indebtedness of $37,500.00. In June of the same year a Deed of Trust was made ... to secure an indebtedness of $84,000.00. In October of 1989, [Jackson Centre] executed a modification agreement modifying the Union Planters Deed of Trust. All of these documents were signed by [Roark] as President of [Jackson Centre].

> In December, 1989, the [Bank] was contacted by Jean Smith, Secretary/Treasurer of [Jackson Centre] concerning the details of [the] guaranty.

> In January, 1990, [Roark's] duties were limited and he could no longer negotiate financing on behalf of [Jackson Centre].

> The [Bank] notified [Jackson Centre] in January, 1990, that the interest payments were in arrears and that if they were not caught up, then collection procedures would be initiated against them. The interest was paid.

> ....

> Several months later, when interest again became past due, Ben Mehr, again, contacted [Jackson Centre] and at that time the corporation's board requested a meeting with the [Bank].

> The meeting was held in July 1990 at the [Bank]. Directors of [Jackson Centre] present were: Clark Shaw, Gary Deaton, Jean Smith and Lloyd Privett. The directors requested that the [Bank] pursue collection from [Modelink] first but, did not

---

1. The complaint was amended to add Mr. Eady as a third party defendant. The record indicates that Mr. Roark filed a Chapter 7 bankruptcy and suit as to him was subsequently dismissed without prejudice after the entry of judgment in this matter.

give the [Bank] any reason to believe that the guarant[y] agreement would not be honored.

[Modelink] has defaulted on the note executed on October 12, 1989. . . .

Based upon the foregoing, the trial court concluded that Roark had the authority to bind Jackson Centre by signing the guaranty and that the Corporation failed to repudiate Roark's actions prior to the Bank's filing suit.[2] A judgment in favor of the Bank was entered accordingly.[3]

Jackson Centre appeals to this Court presenting the following issues for our review:

1. Was there implied authority for Mr. Roark to enter [Jackson Centre] into an agreement with [Bells Banking] to guarantee Modelink's debt?

2. Was there apparent authority for Mr. Roark to enter [Jackson Centre] into an agreement with [Bells Banking] to guarantee Modelink's debt?

3. Did the Board of Directors of [Jackson Centre] ratify the guarantee agreement between Mr. Roark and [Bells Banking]?

We review this case in accord with Rule 13(d) T.R.A.P. which provides for a *de novo* review upon the record, accompanied by a presumption of correctness of the trial court's findings of fact, unless a preponderance of the evidence is otherwise. *See, e.g., Town of Bruceton v. Arnold,* 818 S.W.2d 347, 349 (Tenn.App.1991). The trial court's conclusions of law are also subject to *de novo* review on appeal but without any presumption of correctness. *See Presley v. Bennett,* 860 S.W.2d 857, 859 (Tenn.1993).

■ We consider first the issues relating to Roark's authority to bind Jackson Centre to the agreement in question. As stated in 3 C.J.S. *Agency* § 410 (1973), "[a] principal is bound neither by contracts made by a person not his agent, nor by those of his agent beyond the scope of his actual and apparent

authority, which he has not ratified and is not estopped to deny." *See also Bagley & Co. v. Union–Buffalo Mills Co.,* 9 Tenn.App. 63, 67–68 (1928). Implied authority has been defined as:

[A]ctual authority given implicitly by the principal to his agent; . . . it is actual authority circumstantially proved, or evidenced by conduct, or inferred from a course of dealing between the alleged principal and the agent. It differs from apparent authority in that it is authority which the principal intended that the agent should have.

. . . .

. . . . Implied powers . . . must be bottomed on some act or acquiescence of the principal, express or implied.

. . . their existence or nonexistence in any particular instance being always determinable by reference to the intention of the parties.

2A C.J.S. *Agency* § 153 (1972). Apparent authority is most often defined as:

Such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; such authority as he appears to have by reason of the actual authority which he has; such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess.

*Rich Printing Co. v. McKellar's Estate,* 330 S.W.2d 361, 376 (Tenn.App.1959); *see V.L. Nicholson Co. v. Transcon Inv.,* 595 S.W.2d 474, 483 (Tenn.1980).

■ It is well settled that apparent authority must be established through the acts of the principal rather than those of the agent. *E.g., Franklin Distrib. Co. v. Crush Int'l,* 726 S.W.2d 926, 931 (Tenn.App.1986). Such requirement was adopted by our state supreme court in *Southern Railway Co. v.*

---

**2.** We find the trial court's judgment in this respect somewhat inconsistent as it is only the "unauthorized" acts of the agent that the principal has opportunity to repudiate. *E.g., Intersparex Leddin KG v. Al–Haddad,* 852 S.W.2d 245, 247 (Tenn.App.1992); *Corim, Inc. v. Sam Blair Co.,* 721 S.W.2d 256, 259 (Tenn.App.1986).

**3.** Upon motion, the trial court amended the judgment to, *inter alia,* award a judgment in favor of Jackson Centre as against Modelink and Eady to the extent of the Corporation's liability to the Bank.

*Pickle,* 138 Tenn. 238, 197 S.W. 675 (1917), when stating:

> The apparent power of an agent is to be determined by the acts of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority.

*Southern Railway,* 197 S.W. at 677; *see also Franklin Distrib.,* 726 S.W.2d at 931.

■ With the foregoing legal principles in mind, we consider the record before us. As found by the trial court, the proof shows that various lease agreements, deeds of trust and a "Modification and Extension of Trust Deed" agreement were executed by Roark as president of Jackson Centre. However, the record also evidences the Board of Director's prior approval of Roark's actions in these matters: first, in the form of two corporate resolutions, signed by the Board of Directors, allowing "any officer of the Company" to execute any and all agreements necessary to effectuate the Corporation's borrowing of certain funds (these resolutions pertain specifically to two of the trust deeds introduced at trial on which only the signature of Roark appears and were adopted prior to Roark's execution of the latter) and, secondly, in the unrefuted testimony of board member, Jean Smith. When questioned about Roark's duties toward the Corporation (prior to his execution of the guaranty), Smith replied:

> A [Roark] . . . chaired the board. Because we were small, the board felt that they needed to be very active because we had to take . . . other people's investment dollars. Therefore, [Roark] worked fairly closely with the board.
>
> . . . He was evaluating the downtown as far as properties, their potential uses and their assessment. . . .
>
> . . . he oversaw the maintenance of the buildings, he initiated contacts as far as leases, he helped oversee the restoration of some of the buildings. And on all of this, he was reporting back and working with the board.

> Q . . . . What was the board's policy in regard to [Roark's] authority to execute leases with other people?
>
> A He presented to the board the leases prior to the actual—The leases that are exhibits are actually the final copy after it was written. He would present a penciled-in copy with the amounts to the board for us to approve.
>
> Q Was that done every time that there was a potential tenant?
>
> A I believe, in fact, I still have some of the penciled-in copies.
>
> Q . . . you mentioned that there was one time that, I believe, [Roark] did sign a lease without prior approval.
>
> A That is correct. And the board was not pleased. . . . He was not given the authority to lease the buildings without getting approval from the board.
>
> . . . .
>
> Q But each particular tenant was approved ahead of time by the board with that one exception you mentioned.
>
> A That is all I can recall, that one exception.

Smith confirmed that in January 1990, Roark's duties were limited and that "[a]ll authority was taken away from him." She explained, however, that "[a]nything as far as rentals, not only in January but prior to January, was supposed to be approved by the board."

Smith further related that Roark had no authority to execute promissory notes, guaranty agreements or trust deeds on behalf of the Corporation without prior board approval. She testified that Roark had the prior approval and specific authority of the Board to sign each of the trust deeds and the modification agreement that were submitted into evidence. Smith announced that Roark had no ongoing authority to sign any kind of financial documents, although he had requested it. She was questioned:

> Q . . . in each and every instance when Jackson Centre obtained financing from any party, a private party or a lending institution, the board deliberated concerning that loan and made a specific decision

in regard to whether Mr. Roark was to be given the authority to sign those documents. Is that correct?

A That is correct. Because each of us guaranteed on a personal basis. So, there was considerable discussion prior to any of those loans.

Smith stated that Jackson Centre had never guaranteed the debts of others and that at no time was Roark given the authority to guarantee any loans in the Corporation's name. The record includes two guaranty agreements (other than the one at issue here) wherein the individual directors guaranteed the payment of certain loans made to the Corporation. Both documents bear the signatures of all the board's directors.

As to that initial meeting of Privett, Roark and Mehr, Privett testified that he introduced Roark to Mehr, using words to the effect that Roark was "general manager" of the Corporation. Privett asked Mehr if he had heard of Jackson Centre and informed him that they "were trying a renovation, revitalization of Jackson, and [asked] if he had any interest in financing a building if [they] had one to come up. At that time [they] had no building to purchase." Mehr does not dispute that Privett questioned him regarding "money to finance some buildings in Jackson...." According to Mehr, Privett identified himself as being "associated" with Jackson Centre. Mehr does not remember whether or not Privett identified himself as a director. Mehr stated that Privett informed him that Roark "would be the guy that was managing [Jackson Centre] and looking after it; that he'd be the guy that I'd be dealing with." Mehr said that he had no other contact with Roark or any board member prior to the guaranty's execution.

After careful review, we find that the record fails to reveal any conduct or course of dealing between Roark and Jackson Centre which would evidence the Corporation's intent that Roark have such authority as that at issue here. Thus, we conclude that Roark had no actual authority for his actions. To determine whether Roark's actions were within the apparent scope of his authority, we must, as heretofore noted, look to the acts of Jackson Centre. Clearly, the Board re-

quired prior approval on any transactions entered into by Roark which would bind the Corporation. All leases, deeds of trust and the one modification agreement were executed by Roark after obtaining board approval, with the one exception noted by Ms. Smith. It is not disputed that this latter act met with the Board's strong disapproval. As to Privett's introduction of Roark to Mehr, Mehr's own testimony indicates that he is uncertain as to whether Privett actually introduced himself as a "director" of the Corporation, capable of granting any authority to Roark to act on Jackson Centre's behalf. Also, Mehr testified that discussion among the three concerned the "financ[ing] of some buildings" for Jackson Centre. Nothing was mentioned regarding the guaranteeing of other corporate loans or, for that matter, any other assistance to Jackson Centre other than the actual purchasing of buildings. Thus, we find Privett's comment that Roark was the guy to deal with insufficient to establish a holding out of Roark by the Corporation as possessing the authority to guarantee third party loans in the name of the Corporation.

We further do not find the record to indicate any conduct by Jackson Centre which would have allowed Mehr to "naturally suppose" that Roark had authority for the action taken. Clearly, there must have been some question in Mehr's mind as to Roark's authority regarding execution of the guaranty because Mehr initially sought a corporate resolution. Mehr testified that although he gave a blank corporate resolution to Roark for the Board's completion, he proceeded to make the loan to Modelink without first obtaining the signed resolution from the Board. Mehr further testified that Roark and Eady came to the Bank with the two letters, met with Mehr, discussed the loan, the loan papers including the guaranty agreement were signed and the funds issued all at that time.

A third person, by undertaking to deal with a known or ·purported agent, is put upon inquiry as to the nature and scope of his powers, and must use due care to discover them or else suffer the consequences if they are exceeded.

....

In applying this rule, it has been held that no one is bound to deal with an agent, and, that where anyone does so as to matters beyond the actual authority conferred, any trust and confidence as to such matters is reposed by him and not by the principal, so that the latter cannot be deemed liable under the principle that where one of two innocent parties must suffer from the wrongful acts of a third person, that one must bear the loss who by a confidence reposed in the person acting wrongfully has made it possible.

2A C.J.S. *Agency* § 168 (1972).

*Continental Ins. Co. v. Schulman,* 140 Tenn. 481, 205 S.W. 315, 317–18 (1918) holds that where an agent usually does certain things respecting his principal's business or if similar agents in the same business usually do like things, then the doing of such things are within his apparent authority regardless of his actual authority. But if the agent does a thing considered unusual in his line of business, then such thing is apparently beyond the scope of his authority. The record includes the undisputed testimony of Gary Taylor who stated that he has been in the contracting/development business since 1980. He has worked with other developers in the industry, both corporate and individual. Taylor stated that corporate developers do not usually give their officers the power to guarantee loans in the corporation's name or any "ongoing" power to guarantee loans. When asked, "[h]ave you ever known of an officer of a corporation having the authority to guarantee a loan in the corporate name without prior board or shareholder[ ] approval of that specific act?", Taylor replied, "[n]o, sir." We conclude that Roark was acting outside the scope of his apparent authority when executing the guaranty and that his actions were not binding on the Corporation,

absent any subsequent ratification by the Board.

■ The final issue concerns whether, despite Roark's lack of authority to execute the guaranty, Jackson Centre, nonetheless, ratified his actions. Ratification is the express or implied adoption and confirmation by one person of an act or contract performed or entered into in his behalf by another who assumed to act as his agent without authority to do so. Ratification is confirmation after conduct. *Bagley & Co. v. Union–Buffalo Mills,* 9 Tenn.App. at 68. It is further stated in 2A C.J.S. *Agency* § 71 (1972) that for a ratification to exist, there must be a concurrence of three elements: "(1) [a]cceptance by the principal of the benefits of the agent's act, (2) with full knowledge of the facts and (3) circumstances or an affirmative election indicating an intention to adopt the unauthorized arrangement."

■ It is obvious in this case that no benefit has been bestowed upon or accepted by Jackson Centre. The purported "agreement" between Jackson Centre and Modelink, as evidenced by the two letters shown Mehr prior to the guaranty's execution, was just that. The record indicates that the letters were written between Roark, as president of Jackson Centre, and Eady, purporting to obligate Eady to perform certain services for Jackson Centre. The letters are dated the 25th and 26th days of September 1989, respectively. Smith testified that the Board was unaware of these letters prior to January 1990 and that Jackson Centre never authorized any such "agreement."[4] The record does not suggest otherwise.[5] The record further indicates that Jackson Centre did not receive any portion of the monies loaned Modelink.[6]

---

**4.** According to Smith's testimony, and as further evidenced in the minutes of a board of director's meeting, Roark admitted to the Board that he had no authority to execute the corporate guaranty, but that he felt the action was necessary and in the best interests of Jackson Centre; if Modelink had performed, Roark believed the Board would not have been upset. The Board disagreed, however.

**5.** The record indicates that Roark on several occasions encouraged the Board to employ Eady for the rendering of certain services and, in fact, the Board ultimately paid Eady several thousand dollars for his services. These transactions are unrelated to the purported agreement herein referenced.

**6.** The proof also shows that Roark himself paid the interest payments that were in arrears on the note.

The court of appeals in *Hill v. Hill*, 241 S.W.2d 865 (Tenn.App.1951) held:

> In the absence of a retention of benefits with knowledge of the fraud the principal can be held [liable] for the agent's fraud only if perpetrated while acting within the course and scope of the agent's authority. It is not sufficient to impose liability upon the principal that the principal might have benefited by the agent's wrongful and unauthorized act.

*Hill*, 241 S.W.2d at 871. As noted, Jackson Centre has in no way benefited from any of Roark's actions at issue here. Moreover, we have determined that Roark was acting outside the scope of his authority. We, therefore, hold that under these circumstances Jackson Centre cannot be held liable under the corporate guaranty.

Accordingly, the judgment of the trial court entered in favor of Bells Banking is reversed and this cause remanded for any further proceedings deemed necessary. Costs are assessed against Bells Banking Company, for which execution may issue if necessary.

CRAWFORD, P.J. (W.S.), and HIGHERS, J., concur.