# IN THE COURT OF APPEALS OF TENNESSEE
## WESTERN SECTION AT NASHVILLE

| | | |
|---|---|---|
| SOUTHERN REHABILITATION SPECIALISTS, INC., | ) ) ) | |
| Plaintiff/Appellee | ) ) | Cheatham Chancery No. 7856 |
| VS. | ) ) | Appeal No. 01A01-9607-CH-00345 |
| ASHLAND HEALTH CARE CENTER, INC., d/b/a OAKMONT CARE CENTER; and DON L. BREWER, GARY BREWER, GARY G. BROWN, and S. W. CREEKMORE, JR., PARTNERS d/b/a OAKMONT CARE CENTER, | ) ) ) ) ) ) ) ) ) | |
| Defendant/Appellant, | ) ) | |
| MONARCH NURSING HOME, INC., | ) ) | |
| Third Party Defendant. | ) | |

APPEAL FROM THE CHANCERY COURT OF CHEATHAM COUNTY
AT ASHLAND CITY, TENNESSEE
THE HONORABLE LEONARD W. MARTIN, CHANCELLOR

**ROBERT A. ANDERSON**
Nashville, Tennessee
Attorney for Appellant, Ashland Health Care Center, Inc.

**ROBERT L. PERRY, JR.**
Ashland City, Tennessee
Attorney for Appellee, Southern Rehabilitation Specialists, Inc.

**REVERSED AND REMANDED**

**ALAN E. HIGHERS, J.**

**CONCUR:**

**DAVID R. FARMER, J.**

**HOLLY KIRBY LILLARD, J.**

Defendant Ashland Healthcare Center, Inc. (Ashland), appeals the judgment entered against it in this breach of contract action. The contract at issue was between Plaintiff/Appellee Southern Rehabilitation Specialists, Inc. (Southern Rehab), and Oakmont Healthcare Center (Oakmont). In imposing liability against Ashland, the trial court ruled that Pete Prins, the administrator of Oakmont and an employee of third-party defendant Monarch Nursing Homes, Inc. (Monarch), had the authority to bind Ashland to the contract between Southern Rehab and Oakmont. For the reasons hereinafter stated, we reverse the judgment against Ashland and remand for further proceedings.

Southern Rehab provides rehabilitation services to hospitals, nursing homes, and other health care institutions. In May 1993, Michael Waldrop, Southern Rehab's corporate secretary, visited Ashland City, Tennessee, to solicit business. There, Waldrop met with a nursing home administrator named John Pugh, whose office was located across from the courthouse. During the meeting, Pugh showed Waldrop the blueprints of a new nursing home facility being constructed in Ashland City, and Pugh pointed on the plans to where rehabilitation services would be offered at the facility. The title on the blueprints included the name, "Ashland Healthcare Center, Inc." When Waldrop inquired about Ashland Healthcare Center, Inc., Pugh explained that Ashland, which had purchased the land and was building the facility, was a reputable company based in Fort Smith, Arkansas. Pugh also took Waldrop to the construction site to view the facility while it was being built.

Waldrop subsequently submitted a proposal to provide rehabilitation services at the new nursing home facility, but he did not receive a response to his proposal for several months. Then, in late September 1993, Waldrop received a telephone call from someone named Pete Prins, who informed Waldrop that Southern Rehab had been awarded the contract at "Oakmont." Prins explained that "[t]he state was coming in to inspect and unless he had a rehab contract on the premises, then he wouldn't be granted the license." After further discussion, Waldrop realized that Prins was referring to the nursing home facility recently built by Ashland in Ashland City.

2

Waldrop and Prins negotiated and, on September 29, 1993, executed a contract wherein Southern Rehab agreed to provide rehabilitation services at the new facility. On the contract, Prins instructed Waldrop to fill in the name "Oakmont Healthcare Center" as the contracting facility. Waldrop did not question Prins about the facility's name as it appeared on the contract, and he did not ask any questions about the relationship, if any, between Ashland Healthcare Center, Inc., and Oakmont. Based on the previous information which he had received from John Pugh, Waldrop assumed that Oakmont and Ashland were the same entity. Southern Rehab began providing services to Oakmont under the contract in October 1993.

By January 1994, Waldrop was experiencing difficulties collecting payments due from Oakmont under the contract. When Waldrop talked to Prins about the collection problems, Prins gave Waldrop two telephone numbers, one to Ashland's offices in Fort Smith and the second number to an entity named Monarch Nursing Homes, Inc., in Dallas, Texas. Waldrop called both numbers, and within a week, Waldrop received a check from Oakmont for about $5000. When Waldrop again experienced problems collecting payments, he again contacted Ashland's offices in Fort Smith. This time, the party answering the phone put Waldrop in touch with Ashland's president, S.W. Creekmore, Jr. During his subsequent conversation with Creekmore, Waldrop expressed reservations about the "people [who] were managing [the nursing] home." Creekmore responded by indicating that he would talk to "Mr. Brewer" about the problems Waldrop was having. Waldrop later received another check from Oakmont, this one for about $4150.

After he began experiencing problems collecting payments due under the contract, Waldrop decided to obtain more information about Oakmont. In January 1994, Waldrop visited the offices of the Board for Licensing Health Care Facilities in Nashville. While there, Waldrop examined the licensing file on Oakmont, and he discovered that the license application was made in the name of Ashland Healthcare Center, Inc., d/b/a Oakmont Care Center. The application listed the names and addresses of Ashland's officers, including Creekmore, as well as financial and other references. The application also indicated that

3

Monarch had a management contract to operate the facility. Pete Prins signed the application as facility administrator. Waldrop also obtained a copy of the United States Department of Health and Human Services "Disclosure of Ownership and Control of Interest Statement," which showed the name of the facility to be Ashland Healthcare, Inc., d/b/a Oakmont Care Center, and the owner of the facility to be Ashland Healthcare, Inc., in Fort Smith . Again, the form was signed by Pete Prins as facility administrator.

Once Waldrop satisfied himself that Ashland, in fact, owned the facility, he decided that, despite the payment problems, Southern Rehab would continue to provide services to Oakmont under the contract. From his examination of Oakmont's licensing file, Waldrop knew that Monarch had a contract to manage the facility, but such management contracts were common in the nursing home industry. In Waldrop's view, Ashland, as owner of the facility and holder of the nursing home license, had ultimate responsibility for Oakmont's financial obligations. Oakmont continued to fail to make payments under the contract, however, and Waldrop terminated the contract in May 1994.

After Waldrop terminated the contract, he discovered that Prins and Pugh were employees of Monarch, not Ashland. Waldrop also discovered that, rather than having a contract to manage the facility, Monarch actually leased the facility from Ashland. S.W. Creekmore, Jr., Ashland's president, denied authorizing Monarch to license the facility in Ashland's name.[1] Certain circumstantial evidence, however, supported Southern Rehab's contention that such authority was given. Don Brewer, an officer and one of the owners of Monarch, testified that Monarch was responsible for taking the necessary steps to obtain the initial license for the nursing home. At some point early in the licensing process, Brewer learned that the original license had to be in Ashland's name and that, during the initial license period, Monarch could operate the facility only under a management contract

---

[1]Creekmore also denied exercising any control over Oakmont, Monarch, or their employees. Creekmore admitted, however, that he intervened in at least one other dispute regarding Oakmont's failure to pay its bills, this one involving a local pharmacist. Creekmore further acknowledged that Ashland's parent company, Medical Holdings, Inc., hired a former golf pro to promote goodwill between Oakmont and community leaders in Ashland City.

4

and not under a lease arrangement.[2]   Brewer testified that Creekmore also became aware of these requirements early in the licensing process.   To circumvent the limitation against leasing the facility,[3] Monarch initially managed the facility under an oral management contract.  After obtaining the initial license, however, Monarch's relationship with Ashland reverted to a true lease relationship, as was the intent from the beginning.

In addition to Brewer's testimony, another key piece of evidence supported Southern Rehab's claim that Ashland authorized Monarch to license the facility in Ashland's name. Less than one week before Pete Prins submitted the initial license application in the name of Ashland Healthcare Center, Inc., d/b/a Oakmont Care Center, Ashland's attorney, E. Graham Baker, Jr., sent a letter to the general counsel for the Tennessee Health Facilities Commission informing the commission that the owner of the nursing home had decided "to use the d/b/a 'Oakmont Care Center' as the working name of the facility."   Baker requested that the certificate of need[4] for the nursing home be reissued to reflect this change.  The letter, a copy of which was sent to the licensing board, may have facilitated the board's approval of Monarch's initial license application because the board could have denied the license if the name on the application did not match the name on the certificate of need.  Such assistance by Ashland would have been consistent with provisions of the lease between Ashland and Monarch which required them to "cooperate with each other in obtaining the necessary governmental licenses and permits required to operate a nursing home on the leased premises."

The licensing board eventually learned of the lease arrangement, and Monarch filed a new license application in its own name.  At all times relevant to this litigation, however,

---

[2]See generally T.C.A. §§ 68-11-101 to -250 (1996); Tenn. Comp. R. & Regs. tit. 1200, ch. 8-6-.01 (revised 1992).

[3]Leasing the facility apparently was not an option during the initial license period because, for licensing purposes, a lease was considered to be a change in ownership.  See Tenn. Comp. R. & Regs. tit. 1200, ch. 8-6-.01(2)(e)(3)(ii) (revised 1986).

[4]Under Tennessee law, no person may construct a nursing home or other health care institution without first applying for and receiving a certificate of need from the commission.  See T.C.A. § 68-11-106(a)(1) (1996).

Ashland Healthcare Center, Inc., d/b/a Oakmont Care Center, was the licensee for the facility.

As a result of the foregoing events, in July 1994 Southern Rehab brought this breach of contract action against Ashland Healthcare Center, Inc., d/b/a Oakmont Care Center, and against Don L. Brewer, Gary Brewer, Gary G. Brown,[5] and S.W. Creekmore, Jr., as the alleged partners of Oakmont Care Center. After filing their respective answers denying liability, Ashland and Creekmore filed a third-party complaint against Monarch in which they asserted that Monarch was ultimately liable for any judgment entered against Ashland or Creekmore because Monarch, a Missouri corporation doing business as Oakmont Care Center, was the contracting agency. Monarch answered the third-party complaint and admitted that it was responsible for the payment of monies owed to Southern Rehab for services rendered at Oakmont.

Prior to trial, non-suits with prejudice were entered as to the individual defendants, Don L. Brewer, Gary Brewer, Gary G. Brown, and S.W. Creekmore, Jr. Before proceeding to trial, the remaining parties, Southern Rehab, Ashland, and Monarch, stipulated that the total amount owed to Southern Rehab under the contract was $111,303.04, including all interest which had accrued through January 4, 1996.

At the trial's conclusion, the trial court ruled that Ashland was liable under the contract between Oakmont and Southern Rehab. As grounds for its ruling, the trial court first found that Ashland had acquiesced in Monarch's action of obtaining the nursing home license in Ashland's name:

> I am not persuaded at all that these people [Monarch's employees] were so brazen that they just obtained this license in the name of Ashland without having acquiescence on the part of someone connected with Ashland to do that. And I think [Ashland] did acquiesce.

The court then reasoned:

> I believe Ashland to be culpable because I believe [Ashland] acquiesced in using [its] name for the purposes of obtaining

---

[5]The Brewers and Brown were officers of Monarch.

the license as a matter of convenience to expedite the situation.

And I believe that when some other company, or a member of the public comes in there, relying on that state license, knowing that whoever has got that state license is who [they're] dealing with because [Monarch] can't operate a nursing home without a state license. And I believe they are entitled to rely on [the license]. And I believe that Ashland, thereby, exposed [itself].

In accordance with its ruling, the trial court subsequently entered an order awarding Southern Rehab a judgment against Ashland in the amount of $111,303.04, plus $21,000 in attorney's fees and costs. The trial court awarded Ashland, in turn, a judgment against Monarch in the amount of $132,303.04, plus $20,000 in attorney's fees.

On appeal, Ashland contends that the judgment against it cannot be sustained under any of the agency theories advanced by Southern Rehab at trial. As an initial matter, we must agree with Ashland's contention that the doctrine of apparent authority has no application to this case. A principal is bound by contracts made by its agent, provided the agent is acting within the scope of his actual or apparent authority. Bells Banking Co. v. Jackson Centre, Inc., 938 S.W.2d 421, 424 (Tenn. App. 1996). It is well-established, however, that "[i]n determining questions of apparent agency, the apparent power of the agent is determined by acts of the principal." Durham v. Waddell & Reed, Inc., 723 S.W.2d 129, 130 (Tenn. App. 1986). "Acts of the agent alone will not constitute apparent authority." Id.; accord Southern Ry. Co. v. Pickle, 197 S.W. 675, 677 (Tenn. 1917); Franklin Distrib. Co. v. Crush International (U.S.A.), Inc., 726 S.W.2d 926, 931 (Tenn. App. 1986). To prove apparent agency, the plaintiff generally must establish that:

(1) the principal actually or negligently acquiesced in another party's exercise of authority; (2) the third person had knowledge of the facts and a good faith belief that the

apparent agent possessed such authority; and (3) the third person relied on this apparent authority to his or her detriment.

White v. Methodist Hosp. S., 844 S.W.2d 642, 646 (Tenn. App. 1992) (citations omitted).

At trial, Southern Rehab sought to establish apparent agency through Ashland's action in allowing Monarch to license the facility in the name of Ashland Healthcare Center,

7

Inc., d/b/a Oakmont Care Center. The trial court apparently adopted this agency theory because the court found that Ashland acquiesced in Monarch's use of Ashland's name to obtain the initial license for Oakmont and, further, that Southern Rehab was entitled to rely on the information contained in the license when it executed the contract with Oakmont. It was undisputed, however, that Waldrop had not learned of Ashland's action at the time that Southern Rehab entered into the contract with Oakmont. When Southern Rehab executed the contract, the only alleged acts upon which Waldrop had relied were those of Monarch's employees, Pugh and Prins. Inasmuch as Waldrop did not rely to Southern Rehab's detriment on any acts of Ashland, Ashland could not be held liable to Southern Rehab under the doctrine of apparent authority.[6]

We also have considered whether the judgment against Ashland is sustainable under a theory of express or actual authority. If Prins had the actual authority to execute the contract, then the trial court's judgment may be affirmed regardless of Waldrop's knowledge because, "where an agent has the actual authority to perform an act, the one dealing with him need not know of that authority at the time of the transaction to bind the principal if that authority actually existed." McConnico v. Third Nat'l Bank, 499 S.W.2d 874, 883 (Tenn. 1973). We conclude, however, that both the evidence and the trial court's findings preclude us from holding that Prins had express or actual authority to bind Ashland to the contract between Oakmont and Southern Rehab. As this court previously stated,

> The burden of proving an agency relationship is on the person alleging its existence. . . . The scope and extent of an agent's real and apparent authority are questions to be determined by the trier of fact from all of the facts and circumstances in evidence.

Sloan v. Hall, 673 S.W.2d 548, 551 (Tenn. App. 1984) (citations omitted).

Even if Ashland, through Creekmore or another person, authorized Monarch to obtain the initial nursing home license for Oakmont in Ashland's name, Southern Rehab

---

[6]This lack of reliance on facts known at the time of the transaction similarly defeats Southern Rehab's claim that Prins had ostensible authority to bind Ashland to the contract. See Southern Ry. Co. v. Pickle, 197 S.W. 675, 677 (Tenn. 1917); Rich Printing Co. v. Estate of McKellar, 330 S.W.2d 361, 376 (Tenn. App. 1959). We further reject Southern Rehab's suggestion that Ashland, through the subsequent actions of Creekmore, somehow ratified the contract after its execution. See Absar v. Jones, 833 S.W.2d 86, 89-90 (Tenn. App. 1992); Osborne Co. v. Baker, 245 S.W.2d 419, 421 (Tenn. App. 1951).

presented no evidence that this grant of authority extended beyond allowing Monarch to use Ashland's name in the license application. To the contrary, the trial court found that the authority granted relative to the licensing process "was just a short-term thing until they could get the paperwork straightened out" and that there was "no question that it [was] Monarch that was running the place that contracted with [Southern Rehab]." While Ashland may have authorized Monarch to file the license application, the record contains no evidence that Creekmore, or anybody else associated with Ashland, authorized Monarch employees to enter into contracts with third parties on behalf of Ashland.

The trial court's judgment against Ashland is hereby reversed, and this cause is remanded for further proceedings consistent with this opinion. Costs on appeal are taxed to Southern Rehab, for which execution may issue if necessary.


_____HIGHERS, J.


CONCUR:


_____
FARMER, J.


_____
LILLARD, J.

9