# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
November 2, 2009 Session

## JOHNNY C. HENSLEY, v. WHARTON DUKE and SHARON DUKE

**Appeal from the Circuit Court for Greene County**
**No. 05CV473      Hon. Kindall T. Lawson, Judge**

_____

**No. E2009-00482-COA-R3-CV - FILED MARCH 10, 2010**

_____

The landlord brought this action against tenants under the lease agreement for damages allegedly caused by tenants and their animals to plaintiff's property. After an evidentiary hearing, the Trial Court entered Judgment for damages to plaintiff's property and defendants have appealed. On appeal, we modify the Judgment downward and affirm the Trial Court, as modified.

**Tenn.  R. App. P.3 Appeal as of Right; Judgment of the Circuit Court Affirmed, as Modified.**

HERSCHEL PICKENS FRANKS, P.J., delivered the opinion of the Court, in which  CHARLES D. SUSANO, JR., J., and.  D. MICHAEL SWINEY, J., joined.

William S. Nunnally, Greeneville, Tennessee, for the appellants, Wharton Duke and Sharon Duke.

LeRoy Tipton, Jr., Greeneville, Tennessee, for the appellee, Johnny C. Hensley.

# OPINION

## Background

Plaintiff brought this action against defendants for alleged damages the defendants caused to plaintiff's property during their leasehold. The complaint alleged that the defendants rented a residence and a twenty-five acre farm from plaintiff and that defendants had agreed in writing to bear responsibility for all damage to the premises, beyond ordinary wear and tear, caused by their use and occupancy of the property. Plaintiff further alleged that defendants allowed their dogs and horses to cause "tremendous damage" to the property and sought compensation of $50,000.00.

The written agreement referenced was attached to the complaint, which was signed by defendant, Wharton Duke, and dated August 23, 2003. The agreement provides as follows:

> I, Warton [sic] Duke am renting a house and twenty five acres belonging to John Hensley at 7715 Newport Hwy. Greeneville, Tn.
>
> I state that I will maintain the home and surrounding property, including fences, barn and grounds in a proper state of repair consistent with the condition that I found it in.
>
> I further state, I have two dogs in said house which would necessitate the cleaning, repairing or replace the carpet and any other floor coverings and any other damage done to house and to repair or replace to Mr. Hensley's satisfaction.

Defendants answered and admitted that Dr. Sharon Duke had rented the house and surrounding property by oral agreement on a month to month basis for $1,500.00 a month. Further, the answer stated that the written agreement later executed by Mr. Duke and attached to the complaint, was not supported by consideration, and was signed under duress. The answer concluded that it is unenforceable, and further that Dr. Duke had not signed the agreement and she was not bound by its terms. Further, defendants averred that they had treated the property as their own and had made improvements, and generally the animals did not cause any damage. They asked for the return of their $1,500.00 damage deposit, minus the amount it would cost to repair the kitchen floor which was damaged when the mover installed their appliances in the kitchen.

Based on the evidence produced at trial, the Trial Court found for the plaintiff, and on February 11, 2009 entered a judgment in favor of plaintiff, awarding him $16, 496.32 in damages. The Trial Court stated that the written agreement between Mr. Duke and Mr.

Hensley was the key to the case, because by entering into the agreement, Mr. Duke had agreed to a higher duty of care than is usually placed on a lessee.

The Trial Court in his judgment, dissected the claim for damages as follows:

1.     It is reasonable that large dogs living in a house will cause some odor and plaintiff carried his burden on this issue - award of $2,400.00 for carpet and $530 for the removal of the old carpet.

2.     Plaintiff did not carry his burden of showing that the damage to the garbage disposal was related to the Dukes - no award of $216.00.

3.     The Court allowed $1,655.00 for repairs to the driveway.

4.     The Court allowed the cost of repairing and painting all of the cabinets even though the Judge noted that only one door and nothing else was scratched.

5.     The Court allowed $180.00 for the cleaning of the air filter area, noting that the filter was clearly dirty, despite plaintiff's clear testimony that he was no longer seeking reimbursement for this cost.

6.     As to the seeding of the grass, the Court noted that under the usual wear and tear standard, one would expect horses to eat grass and leave bare spots and hoof prints all over the place. However, based on the written agreement, Mr. Duke had agreed to a higher standard, thus the Court awarded plaintiff monetary damages for labor and material for reseeding the pasture and paddock.

7.     Based on the painter's testimony, the Court awarded the costs of labor and material for painting the walls and woodwork but not for the ceilings or the utility room. He deducted one fourth of the painting bill, $800.00, which was attributed to painting the ceilings and $180.00 for painting the utility room.

8.     Because the testimony was that the cost of a tile floor in the kitchen was twice as much as a vinyl floor, the court awarded only one half of the cost of the tile floor, $586.00 instead of $1,173.00.

9.     The Court awarded $3,250.00 for fence repairs even though plaintiff tore out the wire fence rather than repairing it.

10.     The Court awarded $350.00 for replacement of the roof on the small building.

11.     The Court did not address the remaining claims but awarded them to plaintiff.

12.     From the requested damages, the Court also deducted $1,500.00 as the Dukes had paid that amount as a damage deposit.

As stated, the Trial Court awarded $16, 496.32 in damages to plaintiff.

Issues presented for review:

A.      Whether the preponderance of the evidence supported the Trial Court's award of damages to plaintiff?

B.      Whether the Trial Court erred in applying the law of damages in its award to the plaintiff?

C.      Whether the written contract signed by Mr. Duke on August 23, 2003 is enforceable against Dr. Duke?

D.      Whether the plaintiff acted reasonably and with good faith and fair dealing in preparing a lease that required the Dukes to repair the residence to plaintiff's satisfaction?

E.      Whether the plaintiff was guilty of spoliation of evidence?

A trial court's findings of fact in a non-jury trial are reviewed *de novo* upon the record. The trial court is afforded a presumption of correctness unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13 (d); *Wright v. City of Knoxville,* 898 S.W.2d 177, 181 (Tenn. 1995).  In the event the trial court has not provided findings of fact, the appellate court conducts an independent review of the evidence with no presumption of correctness.  *Brooks v. Brooks*, 992 S.W. 2d 403, 405 (Tenn.1999).   This Court reviews credibility determinations made by the trial court with great deference.  *Keaton v. Hancock County Bd. of Educ.,* 119 S.W.3d 218, 223 (Tenn. Ct. App. 2003).

The trial court's conclusions of law are reviewed under a purely *de novo* standard with no presumption of correctness. *Taylor v. Fezell,* 158 S.W.3d 352, 357 (Tenn. 2005).  The determination of the standard to apply when measuring damages is a question of law, *Hopper*, 2005 WL 2077650 at *7, while the determination of the amount of damages is a question of fact.  *Id.* at *12 (citing *Beaty v. McGraw*, 15 S.W. 3d 819,827 (Tenn. Ct. App.

1998).

## Discussion

The Trial Court correctly held that the August 23, 2003 document executed by Mr. Duke at the behest of Mr. Hensley was the agreement that governed the issues in this lawsuit. The oral lease agreement entered into in the fall of 2002 did not specifically address the tenants' obligations as to damage to the property.[1]

The document, executed by Mr. Duke on August 23, 2003, created a specific duty of care owed by the tenants and provided for two separate but related covenants. Mr. Duke promised to maintain the rental house, surrounding property, including the fences, barn and grounds in a state of repair "consistent with the condition" the property was in when he took possession as a tenant. Significantly, this covenant did not include the phrase "except ordinary wear and tear". The covenant also acknowledges that Mr. Duke was keeping two dogs in the rental house and the occupancy of the dogs would necessitate that the carpet and other flooring would require cleaning, repairing or replacement and that other parts of the house damaged would be repaired or replaced to the satisfaction of Mr. Hensley. Mr. Duke promised to maintain the house in the condition he found it in and if any damage occurred to the property, he would repair or replace that which was damaged. Further, the agreement contains the assumption that the dogs would render the flooring in such a state that it would need to be cleaned, repaired or replaced. Finally, the agreement contains the provision that any repairs or replacements must be to the satisfaction of Mr. Hensley. The Trial Court interpreted the latter provision of the agreement to mean "to the **reasonable** satisfaction" of Mr. Hensley. This interpretation is in keeping with case law. *See German v. Ford,* No., W2007-02768-COA-R3-CV, 2009 WL 604951 at * 15 n. 9 (Tenn. Ct. App. Mar. 10, 2009)(citing 13 Richard A. Lord, Williston on Contracts § 38:24 (4th ed. 2000)) which held that "[w]hen a contract is contingent on one party's satisfaction, that party must exercise his or her judgment in good faith and as a reasonable person, when a definite objective test of satisfaction is available; not arbitrarily without bona fide reason for his or her dissatisfaction."

The Trial Court made several findings in support of its damage award but did not

---

[1] In the absence of an express covenant there is an implied obligation on the part of the tenant to treat the rented property in such a manner that no injury is done to it and to return the property to the owner in as good condition as it was received, ordinary wear and tear excepted. *U.S. v. Jordan,* 186 F.2d 803, 806 (6th. Cir. 1951), *aff'd* 342 U.S. 911, 72 S.Ct. 305, 96 L.Ed. 682 (U.S. Tenn. Jan. 14, 1952).

provide factual finding as to all of the claims for damages. Accordingly, we will afford a presumption of correctness to the stated factual findings of the Trial Court unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13 (d); *Wright v. City of Knoxville,* 898 S.W.2d 177, 181 (Tenn. 1995). Where the trial court did not address factual issues, we independently review the evidence with no presumption of correctness. *Brooks v. Brooks*, 992 S.W.2d 403, 405 (Tenn.1999).

While the Trial Court stated that he believed that the parties were all testifying to the best of their recollection, he did make credibility determination on certain issues where the evidence presented by the parties was in sharp dispute, based on contradictory testimony. On these issues, we will give deference to the Trial Court's findings.

The Trial Court awarded $2,400.00 for replacement of the carpet throughout the house and $530.00 for the removal of the old carpet. While disputed evidence is presented on the need for removal, the Trial Court found that the plaintiff and the workmen who were at the house after the defendants left were more credible on this issue. The evidence does not preponderate otherwise, and we affirm the monetary awards of $2,400.00 and $530.00, as made by the Trial Court.

The Trial Court allowed $1,655.00 for repairs to the driveway. Plaintiff testified the driveway had been repaved just before he moved to his new house and that there were no holes or indentations in it when he rented the house. Mr. Duke admitted that his truck had caused at least one of the holes. Based on Mr. Duke's promise to leave the property in the same condition as it was in when they rented it, the Trial Court did not err in awarding plaintiff the cost of repairing the driveway to the condition it was in before the Dukes arrived.

The Trial Court noted that the evidence showed that only one door of one cabinet was damaged with scratches. However, despite this finding, the Court awarded the cost of repairing and painting all of the cabinets in the kitchen in the amount of $1,225.00. Plaintiff and a painter both testified the cabinet door looked like it had been chewed or scratched by dogs and Dr. Duke admitted that a cabinet door was scratched. A photograph of a scratched cabinet door was entered into evidence, and the adjoining cabinets looked to be in excellent condition. No details of damage to other cabinets was provided and no other photographs of damaged cabinets were produced at trial. The evidence preponderates against an award for painting all of the cabinets. Accordingly, we reduce the award to $600.00.

The Court allowed $180.00 for the cleaning of the air filter area, noting that the filter was clearly dirty. However, plaintiff testified that he was not seeking reimbursement for this cost. It was error on the part of the Trial Judge, and the damage award should be reduced

by the $180.00 allowed.

As to the seeding of the grass, the Court stated that one would expect horses to eat grass and leave bare spots and hoof prints all over the area where they were kept and that this would fall with in the normal wear and tear exception. However, the Trial Court noted that based on the agreement of August 2003, Mr. Duke had agreed to a higher standard of care, thus the Court awarded plaintiff monetary damages for labor and material for reseeding the pasture and barn area where the horses were kept. Plaintiff's testimony and numerous photographs admitted into evidence established that the pasture and barn area were lush with grass before the Dukes and their horses arrived on the property. Testimony of both parties and photographs showed that much of the area where the horses were kept was denuded of grass by the time the Dukes vacated the property. The evidence established that defendants did not return the barnyard and pasture to the same condition defendants had found them in. The Trial Court awarded Mr. Hensley $1,478.00, based on an estimate Mr. Kiker had provided for what he described as "work ground, spray and sow barn lot and part of field". Mr. Kiker testified at trial regarding the work he actually performed, and Mr. Hensley testified that he and his boys did some of the work listed on Mr. Kiker's estimate. Under the circumstances, we affirm the Trial Court on the award of $1, 478.00.

Based on the painter's testimony, the Court awarded the costs of labor and material for painting the walls and woodwork but not the ceilings or the utility room. He deducted one fourth of the painting bill, $800.00, which Mr. Hicks had attributed to painting the ceilings and $180.00 for painting the utility room.[2] Hensley and Hicks testified that the walls in the house were not in pristine condition after the Dukes moved out. They both stated the walls looked like furniture had been banged into them, but Dr. Duke denied that there were marks on the walls. The testimony of the parties was in clear conflict and the Trial Court obviously believed Mr. Hensley and Mr. Hicks over the defendants. We defer to the Trial Court on this issue, and affirm that award.

There was conflicted testimony by the parties as to the condition of the bath tubs and some tile in the great room after the Dukes left the property. Plaintiff claimed the tubs had extensive scratching, and that the tile in the great room was intact and in good condition when the Dukes moved in but when they left, the tile was loose and some of the grout was missing. The Dukes denied any damage, and Mr. Hicks testified that he repaired the tubs and the tile for $100.00. We affirm the Trial Judge on this determination.

Defendants also appeal the Trial Judge's damage award for Hicks' labor for the painting of the basement and garage. Hicks testified to the poor condition of the walls, floors

---

[2] The trial court' decision regarding the utility room and ceilings was not appealed.

and ceilings in these parts of the house and Mr. Hensley testified that both had been freshly painted prior to the Dukes taking possession of the property. The Dukes denied any damage to the basement or garage, but the Trial Judge believed the plaintiff and Hicks, and we defer to the Trial Court's determination of credibility on this issue and affirm the Trial Court's judgment as to the painting of the walls, woodwork, basement and garage. .

The Trial Judge also awarded plaintiff $1,106.32 for the materials he purchased for the painter's use. As noted, the trial court reduced the amount of damages associated with the painter's labor by $980.00, the charge for painting of the ceilings and utility room as there was no evidence that either had been damaged by the Dukes. However, we find no basis to reduce the cost of the materials.

The Trial Court awarded $3,250.00 for damage to a barbed wire fence even though plaintiff tore out the wire fence rather than repairing it. The amount was based on Kiker's written estimate for "repair bent post, page wire top rail, wire and gates (643 ft)". Hensley claimed that he and his sons removed this fence rather than repairing it. There was no evidence from the plaintiff of the condition of this fence prior to the Dukes occupancy, no evidence introduced by plaintiff as to the actual damage alleged to have been caused by the Dukes or their horses and no evidence regarding the actual work expended by plaintiff and his sons when they removed the fence. Moreover, Mr. Kiker did not address what he based his estimate on nor did he mention the barbed wire fence at all when he testified. The only evidence the Trial Court had on this item of damage was Dr. Duke's testimony that the fence was old, brittle and in poor condition. We conclude the evidence preponderates against the Trial Court's award of $3,250.00 for removal of the old fence, and the final damage award is also reduced by $3,250.00.

The Court awarded $350.00 for replacement of the roof on the small building, which was referred to as the dog house. Mr. Hensley did not testify on the condition of the roof prior to the Dukes' tenancy, or any damage the roof of the outbuilding had sustained while the Dukes' lived there and there was no evidence of what repairs were done to it after they left the premises. The only evidence pertaining to this roof is that it is one of the items on the Kiker written estimate that Mr. Hensley claimed he and his sons performed themselves. As there is no evidence regarding the condition of the dog house before or after the Dukes tenancy, we conclude the Trial Court erred in making this reward, and the final damage award is reduced by $350.00.

The Dukes appeal the award of $900.00 for the repair of the wooden fence by Mr. Kiker, but they do not deny their horses caused some damage to the wooden fences and Dr. Duke admitted that she damaged a fence while mowing. The Dukes, however, claim that they repaired the wooden fences before they left the property and they produced photographs

showing where they had spliced the broken planks with boards. On the other hand, Mr. Hensley testified that the fence had been significantly damaged by the horses and that it was in much need of repair. Likewise, Mr. Kiker felt the fence, as left by the Dukes, was in need of repair and he testified that he replaced quite a few planks. According to the controlling agreement signed by Mr. Duke, the property was to be repaired to the satisfaction of Mr. Hensley, and he was entitled to have the fence restored to the condition it was in when the Dukes arrived. Thus, replacement of the boards, instead of splicing, was appropriate. The evidence supports the Trial Court's award of $900.00 for the repair of the wooden fence.

For the foregoing reasons, the final judgment will be reduced by the amounts herein set forth.

Next, the Duke's contend the terms of the August 23, 2003 agreement signed by Mr. Duke are not enforceable against Dr. Duke, as she did not sign the agreement and was not a party to the agreement. The Dukes cite no authority to support their position nor does their brief explain why this is an important issue. The issue was raised by defendants in their answer but it was not specifically argued at trial.

Dr. Duke testified that her husband told her of the agreement after he had entered into it. There was no evidence that Dr. Duke took any action to nullify the agreement or disavowed it in any way. The evidence did show that the Dukes continued to live in the rental house for fourteen months after Mr. Duke signed the agreement.

Plaintiff makes several arguments as to why Dr. Duke is bound by the agreement, but the applicable argument that Dr. Duke is liable for the obligations undertaken by the agreement is based on the agency theory. Plaintiff contends Mr. Duke was acting for himself as the agent of his wife when he signed the agreement. Unless prevented by public policy, a statute, or a contract requiring personal performance, what a person can lawfully do himself, he can do through an agent. *Mabey v. Maggas,* No. M2006-02689-COA-R3-CV, 2007 WL 2713726 at * 8 (Tenn. Ct. App. Sep. 18, 2007)(citing *Mays v. Brighton Bank*, 832 S.W.2d 347, 351 (Tenn. Ct. App.1992)). An agent has been defined as one who undertakes to transact some business or to manage some affair for another by the authority and on account of the latter. *Mabey* at * 8 (citing *Electric Power Bd. of Metro. Gov't of Nashville and Davidson County v. Woods*, 558 S.W.2d 821, 824 (Tenn. 1977); *General Constr. Contractors Ass'n, Inc. v. Greater St. Thomas Baptist Church*, 107 S.W.3d 513, 522 (Tenn. Ct. App. 2002). This delegation may be manifested by an express authorization or it may be implied from the circumstances and the conduct of the parties. *Mabey* at * 8 (citing *Mays*, 832 S.W.2d at 351).

Under Tennessee law a court will not assume an agency relationship between two

people just because they are married. *In re Suit,* Bkrtcy No. 08-31906, 2009 WL 943536 at *7 (Bkrtcy.E.D.Tenn. Apr. 6, 2009)(citing *Martin v. Coleman*, 19 S.W.3d 757, 761 (Tenn. 2000)). A married person may be authorized to act for the other spouse but such authority cannot be implied based only on the marital relation." *Goode v. Daugherty*, 694 S.W.2d 314, 317 (Tenn. Ct. App.1985)(quoting 41 AM.JUR.2D Husband and Wife § 241 (1968)). Whether an agency relationship exists between spouses rests on the same considerations as any other agency. *Id.* The existence of an agency relationship is a question of fact under the circumstances of a particular case, based upon an examination of the parties' actual relationships, agreements, or conduct. *Bostic v. Dalton*, 158 S.W.3d 347, 351 (Tenn. 2005). Testimony of an alleged agent is competent to prove agency, *Mabey* at * 9(citing *Kerney v. Aetna Cas. & Sur. Co.*, 648 S.W.2d 247, 253 (Tenn. Ct. App.1982)) and if the testimony of the alleged agent is not contradicted by direct evidence or by circumstances inconsistent with its truth it must be taken as true. *Mabey* at * 9 (citing *Ray Carter, Inc. v. Edwards*, 222 Tenn. 465, 469-470, 436 S.W.2d 864, 866 (Tenn.1969)).

Here, there was a paucity of testimony from either Dr. Duke or Mr. Duke about the August 2003 agreement. The evidence is clear that only Mr. Duke signed the agreement, that only he knew the terms of the agreement when he signed it and that neither of the Dukes anticipated that Mr. Hensley would make such demands on them before he actually did so. Accordingly, the Trial Court's finding that both Dukes were liable to plaintiff under the agreement, cannot be upheld unless there was a showing that once the agreement was made by Mr. Duke and made known to Dr. Duke, she ratified the agreement.

This Court, in *Monumental Life Ins. Co. v. Puckett,* No. W2005-00083-COA-R3-CV*, 2006 WL 44037 (Tenn. Ct. App. Jan. 9, 2006) discussed ratification of a non-authorized contract.

A fundamental principle of agency law is that "[a] principal is bound neither by contracts made by a person not his agent, nor by those of his agent beyond the scope of his actual and apparent authority, which he has not ratified and is not estopped to deny." *See, e.g., Bells Banking Co. v. Jackson Ctr., Inc.,* 938 S.W.2d 421, 425 (Tenn.Ct.App.1996). Although an unauthorized contract is generally voidable by the principal, a principal who ratifies that contract is bound by its terms as if he or she had executed it originally. *See* 12 Williston on Contracts § 35.22 (4th ed.1999) (stating that ratification by a principal "relates back and supplies original authority to execute the contract"). Ratification of a contract occurs when one approves, adopts, or confirms a contract previously executed "by another[,] in his stead and for his benefit, but without his authority." *James v. Klar & Winterman,* 118 S.W.2d 625, 627 (Tex.Ct.App.1938); *see also Gay v. City of Somerville,* 878 S.W.2d 124, 127 (Tenn.Ct.App.1994) (defining "ratification" as "the express or implied adoption and

confirmation by one person of an act or contract performed or entered into in his behalf by another who assumed to act as his agent without authority so to do"). Simply stated, "ratification is confirmation after conduct." *Gay,* 878 S.W.2d at 127.

Before ratification of an unauthorized transaction will be considered valid and binding, the principal must have " 'full knowledge, at the time of the ratification, of all material facts and circumstances relative to the unauthorized act or transaction.' " *Gough v. Insurance Co. of N. Am.,* 157 Tenn. 546, 549-50, 11 S.W.2d 887, 888 (1928) (quoting 2 C.J. § 476). Because ratification is usually a question of the principal's intent, this issue is generally regarded as a question of fact to be determined from all of the surrounding circumstances. *See Absar v. Jones,* 833 S.W.2d 86, 89 (Tenn.Ct.App.1992); *Stainback v. Junk Bros. Lumber & Mfg. Co.,* 98 Tenn. 306, 311, 39 S.W. 530, 531 (1897). However, ratification may be established "from the conduct of the purported principal manifesting that he consents to be a party to the transaction or from conduct justifiable only if there is a ratification." *Osborne Co. v. Baker,* 35 Tenn.App. 300, 305, 245 S.W.2d 419, 421 (1951). *Webber v. State Farm Mut. Auto. Ins. Co.*, 49 S.W.3d 265, 269-70 (Tenn.2001) (footnote omitted). "As a general rule, when a knowledge of the unauthorized transaction of the agent comes to the principal, he must with reasonable promptness disaffirm the acts of the agent, or he will be held bound thereby." *Whitfield v. May*, 19 Tenn.App. 431, 89 S.W.2d 764, 769 (1935) (citations omitted). "Silence can amount to a ratification where a party with knowledge of the transaction fails for a reasonable time to protest or dissent." *Valley Fid. Bank & Trust Co. v. Cain P'ship, Ltd.*, 738 S.W.2d 638, 640 (Tenn.Ct.App.1987) (citing *McClure v. Evartson and Mottley,* 82 Tenn. 495 (1884)).

*Monumental Life Ins. Co. v. Puckett* at *3.

The evidence in this case supports the finding that Dr. Duke ratified the agreement once she became aware of the terms. Dr. Duke testified that she acquired full knowledge of the agreement after her husband signed it, and no evidence was presented that Dr. Duke took any action to "disaffirm" the acts of her husband or that she ever discussed the agreement with Mr. Hensley once she learned of it. Dr. Duke continued to live in the house, kept two dogs in the house and kept up to fourteen large horses on the property for fourteen months after Mr. Duke signed the agreement. Dr. Duke's knowledge of the terms of the agreement along with her silence as to the terms and her continued occupancy of the property is sufficient to show that she ratified the agreement. The Trial Court did not err when it found both of the Dukes liable to the plaintiff.

The defendants raise the issue of whether plaintiff acted reasonably and with good

faith and fair dealing when he presented Mr. Duke with the agreement. This issue was not raised in the pleadings, nor was it raised at trial. Accordingly, the Court will not consider the issue on appeal. *Jordan v. Jordan,* No. W2002-00854-COA-R3-CV, 2003 WL 1092877 at *8 (Tenn. Ct. App. Feb. 19, 2003)(citing *Lovell v. Metro. Gov't*, 696 S.W.2d 2 (Tenn.1985); *Lawrence v. Stanford*, 655 S.W.2d 927 (Tenn.1983)).

Next, defendants claim that the damage award in connection with the replacement of the carpet should be reversed under the doctrine of spoliation of evidence because plaintiff did not produce any pictures of the damaged carpet, and disposed of the carpet before defendants could examine it and did not preserve samples of the alleged damaged carpet.

The doctrine of spoliation of evidence permits a court to draw a negative inference against a party who has intentionally, and for an improper purpose, destroyed, mutilated, lost, altered, or concealed evidence. *Kincade v. Jiffy Lube*, No. W2007-00995-COA-R3-CV, 2008 WL 1970348 at *4 (Tenn. Ct. App. May 8, 2008)(citing *Bronson v. Umphries,* 138 S.W.3d 844, 854 (Tenn. Ct. App.2003); *Leatherwood v. Wadley,* 121 S.W.3d 682, 703 (Tenn.Ct.App.2003); *Foley v. St. Thomas Hosp.,* 906 S.W.2d 448, 453-54 (Tenn.Ct.App.1995)). This inference is rebuttable and arises only when the spoliation occurs in circumstances indicating fraud and a desire to suppress the truth. *Kincade* at * 4.

The evidence does not support defendants' contention on this issue. The evidence showed that the Dukes vacated the rental house in September or October 2004 and that soon afterward Dr. Duke spoke to plaintiff by telephone regarding the refund of the damage deposit. Both parties to this conversation agree that Mr. Hensley put Dr. Duke on notice at that time that he was unhappy with the condition of the house and he claims that he invited Dr. Duke to return to the house so they could discuss what he perceived as damage. Apparently, she did not follow up on this invitation. The evidence showed that attorney G.P. Gaby sent the Dukes a letter on January 25, 2005 on behalf of Mr. Hensley. The letter demonstrates that it was mailed to the Dukes at a post office box in Greeneville. Dr. Duke testified that they had used this post office box while they were in residence at the rental house but did not use it once they moved to their new farm. The letter specifically sets forth the fact that the carpet would need to be replaced due to pet damage and also stated that the premises remained essentially as they had left it. The Dukes were invited to get in touch with Mr. Gaby to arrange an inspection of the premises and to take photographs. Dr. Duke stated that she was not sure if she had received the letter and Mr. Duke stated that he had not seen it until his lawyer showed it to him. The Trial Court indicated that it was not convinced that the Dukes had not received the letter, but even if the Dukes did not receive the letter as they claim, they still had an opportunity to inspect the condition of the carpet and floors as suit was filed on June 28, 2005 and the carpet was not removed until after that time according to the testimony of Mr. Hensley and the invoice of Mr. Kiker. The evidence preponderates

-12-

against a finding that plaintiff removed the carpet before defendants could examine it with intent to defraud or deceive defendants. We affirm the Trial Court on this issue.

The Judgment of the Trial Court, as modified, is affirmed, and the cost of the appeal is assessed one-half to plaintiff and one-half to defendants.

_____
HERSCHEL PICKENS FRANKS, P.J.