# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
February 29, 2012 Session

## EARL THOMAS BURGESS v. FORD MOTOR COMPANY

### Appeal from the Chancery Court for Davidson County
#### No. 072398III   Ellen H. Lyle, Chancellor

### No. M2011-00654-COA-R3-CV - Filed September 28, 2012

A management employee working for Ford Motor Company was to become an employee of Ford's wholly owned subsidiary when the subsidiary was made an independent company. The manager wanted to remain employed by Ford and sought to transfer back to an hourly position before the spinoff took effect. The manager's supervisor promised the manager his benefits and pay would not change as an employee of the subsidiary and that he could return to an hourly position with Ford after the spinoff until such time that the subsidiary was purchased by a third party. The subsidiary was purchased by a third party five years later, but Ford did not permit the employee to transfer back to Ford at that point. After the employee asked to transfer back to Ford, Ford offered its hourly employees a special retirement plan whereby they were offered lifetime health and pension benefits. The employee would have been eligible to participate in this plan if he had been allowed to transfer back to Ford. The employee filed suit against Ford, claiming promissory estoppel and seeking damages based on the amount he would have received under the special retirement plan. A jury found Ford liable for promissory estoppel and awarded the employee damages. Ford appealed, arguing (1) the employee's claim was preempted by the Labor Management Relations Act and (2) the employee failed to prove all the elements of promissory estoppel. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed**

PATRICIA J. COTTRELL, P.J., M.S., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR. and RICHARD H. DINKINS, JJ., joined.

Stanley Eugene Graham, Bahar Azhdari, John J. Park, Nashville, Tennessee, for the appellant, Ford Motor Company.

David W. Garrison, Donald N. Caparella, Scott Patton Tift, Nashville, Tennessee, for the appellee, Earl Thomas Burgess.

## OPINION

### I. BACKGROUND

Earl Thomas Burgess was first employed by Ford Motor Company ("Ford") in 1987. He started out working at the Nashville Glass Plant ("Plant") as an electrician. Mr. Burgess was an hourly employee and member of the United Auto Workers union ("UAW" or "the union") until 1994. In 1994 he was promoted to a salaried position as a supervisor overseeing hourly workers, and in 1999 he was promoted again to the position of Maintenance Planning Specialist. Mr. Burgess remained working at the Plant, but as a salaried employee he became a member of management and was required to give up his union membership. As a manager he was unable to continue taking advantage of the benefits provided under the collective bargaining agreement negotiated between Ford and the union.

In 1999 Ford announced that its subsidiary, Visteon, was going to take over the operations of Ford's parts manufacturers, including the Plant.[1] Once this transfer took effect, Ford's salaried employees working at the Plant, including Mr. Burgess, would become Visteon employees. Ford's hourly employees working at the Plant would continue to be Ford employees, managed by the then-Visteon managers pursuant to an agreement between Ford and Visteon.

Ford's announcement of the Visteon spinoff caused several of the Plant's managers, including Mr. Burgess, to become concerned that their job security and benefits would be adversely affected once they were no longer Ford employees. Some of Mr. Burgess's management colleagues returned to hourly positions at the Plant as Ford employees before the spinoff of Visteon took effect.

On June 6, 2000, Mr. Burgess went to see Dennis Emery about transferring to an hourly position with Ford. Mr. Emery was the salaried personnel supervisor at the Plant and was a Ford employee until the date of the Visteon spinoff. Mr. Burgess believed the Visteon spinoff was going to take place on June 28, 2000, and that he had until that date to return to Ford's hourly rolls.[2]

---

[1]This transaction was referred to as the "Visteon spinoff," and as a result of the spinoff Visteon would become an independent company.

[2]Ford presented testimony and evidence that the spinoff took place on April 1, 2000. Mr. Burgess and Mr. Emery both testified they did not think the spinoff was to occur until June 28, 2000, however, and they believed they were Ford employees until that date.

On June 6 Mr. Burgess told Mr. Emery that he wanted to return to an hourly position before the spinoff took place. Mr. Emery told Mr. Burgess that the Plant Manager, Dave Rourke, wanted to speak with Mr. Burgess about his interest in returning to Ford as an hourly employee, so Mr. Burgess went to meet with Mr. Rourke.[3] Mr. Rourke told Mr. Burgess he preferred Mr. Burgess not return to the hourly rolls at that time because two of the five Maintenance Planning Specialists had recently returned to hourly positions, and Mr. Rourke needed Mr. Burgess to remain where he was to help run the Plant.

Mr. Burgess testified that the reason he wanted to transfer back to an hourly position was for the job security and benefits. Mr. Burgess explained that he was concerned in June 2000 that a third company called Pilkington was going to buy the Plant, and Mr. Burgess did not want to work for a third company. Mr. Rourke promised Mr. Burgess he would get answers to Mr. Burgess's questions about returning to Ford's hourly rolls after the Visteon spinoff and asked Mr. Burgess to remain in his position of Maintenance Planning Specialist for the time being.

Mr. Burgess testified that the following day Mr. Emery called him into his office and told him he had answers to Mr. Burgess's questions. Mr. Emery told Mr. Burgess that his benefits and pay would not change at that time, and that if Mr. Burgess would continue in his position of Maintenance Planning Specialist, he would be able to return to an hourly position with Ford if Pilkington ended up buying Visteon and the Plant.

A few days later Mr. Burgess asked Mr. Emery if he could have the promise Mr. Emery had made to him in writing. Mr. Emery agreed and gave Mr. Burgess a copy of an e-mail he sent to Mr. Rourke and Mark Decker. Mr. Decker was Mr. Emery's supervisor and was the Plant's Human Resources Manager. The e-mail was dated June 7, 2000, and included the following:

> I had a discussion with Tommy Burgess late Wednesday afternoon, and related to him the following on his question about the opportunity for him to return to the hourly rolls as a Ford Motor Company hourly employee at some point in the future, specifically after the June 28th Visteon Independence date:
>
> I explained to Tommy that we have just now been able to get clarification on this issue from appropriate parties at the national level. While Mr. Burgess does not have any contractual right to return to the hourly rolls, at any time, the Company's position has been established that it is a discretionary decision on the part of local management as to whether or not to allow a salaried employee

---

[3]Mr. Burgess testified that Dave Rourke was the highest ranking officer at the Plant.

to do so. I further told Tommy that while each situation will be handled on a case-by-case basis, Dave Rourke, Mark Decker, and I are telling him that he, personally, will be allowed to return to the hourly rolls as a Ford electrician with his Ford hourly seniority intact after June 28th if he should choose to do so ... at least until such time as the expected Joint Venture with Pilkington should become a reality.

Mr. Burgess expressed to me his appreciation and satisfaction with that response, and seemed to indicate to me that he would respect that position and not request such a transfer in this short term.

Mr. Emery testified that the "appropriate parties at the national level" language he used in his e-mail on June 7 referred to individuals working for Ford at the corporate level who were located in Dearborn, Michigan. Mr. Emery also testified that the language "until such time as the expected Joint Venture with Pilkington should become a reality" referred to such time as any third party purchased the Plant, not just Pilkington.

Mr. Burgess remained at the Plant as a Visteon employee and did not ask again to be returned to the hourly rolls at Ford until five years later. In June 2005 Mr. Burgess learned that the Plant's assets were going to be acquired by a newly formed corporate entity called Automotive Components Holding, LLC. At that point, Mr. Burgess spoke with Gerard Pound, who was Mr. Emery's successor. Mr. Burgess informed Mr. Pound that he would like to return to Ford's hourly rolls and showed Mr. Pound the e-mail from Mr. Emery dated June 7, 2000. Mr. Pound consulted with the senior management at the Plant and informed Mr. Burgess that he was not able to accommodate Mr. Burgess's request. Mr. Pound told Mr. Burgess it was "the company's policy that no one would return to the hourly rolls at [that] time."

On November 1, 2006, Ford offered its hourly employees working at the Plant a special early retirement plan that included lifetime healthcare benefits and lifetime pension benefits. If Mr. Burgess had been able to transfer to an hourly position in June 2005 there is no dispute he would have been eligible to participate in this special early retirement plan. An actuary testified that if Mr. Burgess had been able to participate in this plan, he would have been entitled to receive a total of $312,000 between November 2006 and November 2016, and then about $1,700 each month for the remainder of his life. The actuary testified that the present-day valuation of all the benefits Mr. Burgess would have received under the special early retirement plan was $748,541.

## II. TRIAL COURT PROCEEDINGS

Mr. Burgess filed an action against Ford in October 2007 alleging breach of contract, promissory estoppel, and unjust enrichment/quantum meruit. Mr. Burgess sought damages and asked the court to order Ford to place him in an hourly position, with his seniority and benefits intact. Following discovery, both Ford and Mr. Burgess filed motions for summary judgment. Ford asked the court to dismiss all of Mr. Burgess's claims, and Mr. Burgess moved for summary judgment on his breach of contract claim alone. The trial court granted Ford's motion with respect to Mr. Burgess's breach of contract claim and his unjust enrichment claim, but denied summary judgment with respect to Mr. Burgess's promissory estoppel claim.

Mr. Burgess's claim for promissory estoppel was tried before a jury over a course of seven days. After Mr. Burgess presented his case-in-chief, Ford moved for a directed verdict on the basis that (1) Mr. Burgess's promissory estoppel claim was preempted by Section 301 of the Labor Management Relations Act ("LMRA"), and (2) Mr. Burgess did not prove the elements essential to support a claim of promissory estoppel. The trial court denied Ford's motion. The court then gave the jury instructions and a verdict form with questions to be answered "Yes" or "No":

> 1. Do you find that Mr. Burgess has carried his burden of proving that in June 2000 he was made a clear and definite promise that he could return to the position of a Ford Motor Company hourly bargaining unit employee?
>
> 2. Do you find that Mr. Burgess has carried his burden of proving that the person making the alleged promise should have reasonably expected to induce Mr. Burgess to take action in reliance on that promise or refrain from taking some action in reliance on that promise?
>
> 3. Do you find that Mr. Burgess has carried his burden of proving that the person making the alleged promise had the authority to make the promise on behalf of Ford Motor Company at the time of the alleged promise?
>
> 4. Do you find that Mr. Burgess has carried his burden of proving that he reasonably relied on the alleged promise?
>
> 5. Do you find that Mr. Burgess has carried his burden of proving that the alleged promise actually caused Mr. Burgess to make a substantial change in position in reliance on the promise?

The jury responded "Yes" to each of the questions and awarded Mr. Burgess damages in the amount of $657,641. The trial court then entered an Order of Judgment awarding Mr. Burgess $657,641 in accordance with the jury verdict. Ford filed a Motion for Judgment in Accordance with its Motion for Directed Verdict, or in the alternative, a Motion for a New Trial, which the court denied.

### III. PREEMPTION

In this appeal Ford first argues Mr. Burgess's promissory estoppel claim is preempted by Section 301 of the LMRA. The trial court held that Mr. Burgess's claim was not preempted and denied Ford's motion for directed verdict on that issue. A trial court may direct a verdict on a question of law because such issues are in the province of the court, not the jury. *In re Estate of Marks*, 187 S.W.3d 21, 27 (Tenn. Ct. App. 2005). Additionally, the question of whether a federal statute preempts a state law claim is a question of law. *Lake v. Memphis Landsmen, LLC*, 2010 WL 891867, at *4 (Tenn. Ct. App. Mar. 15, 2010). We review questions of law on appeal using a *de novo* standard of review without a presumption of correctness. Tenn. R. App. P. 13; *Blair v. Brownson*, 197 S.W.3d 681, 684 (Tenn. 2006). Accordingly, we will apply that standard to the trial court's denial of Ford's motion for directed verdict. *Duran v. Hyundai Motor Am.*, 271 S.W.3d 178, 206 (Tenn. Ct. App. 2008).

The LMRA governs agreements between management and labor organizations, or unions, reached through collective bargaining. 29 U.S.C. §§141 *et seq.* Section 301 provides:

> Suits for violations of contracts between an employer and a labor organization
> representing employees in an industry affecting commerce . . . may be brought
> in any district court of the United States having jurisdiction of the parties . . .

29 U.S.C. § 185(a). Although the language used in the statute is permissive, courts have interpreted this provision as requiring lawsuits alleging violations of CBAs to"be brought under § 301[of the LMRA] and determined according to federal law, and further that 'questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort.'" *Alley v. Quebecor World Kingsport*, 182 S.W.3d 300, 303 (Tenn. Ct. App. 2005) (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211(1985)).

The United States Supreme Court has explained that § 301 "expresses a federal policy that the substantive law to apply in § 301cases is 'federal law, which the courts must fashion

from the policy of our national labor laws.'"*Allis–Chalmers Corp.*, 471 U.S. at 209 (quoting *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456 (1957)); *see Jones v. General Motors Corp.*, 939 F.2d 380, 382 (6th Cir. 1991) (federal law envisions a national labor policy that would be disturbed by conflicting state interpretations of the same CBA).

Mr. Burgess's claim would be preempted by § 301 if either (1) resolving Mr. Burgess's state law claim would require interpreting the terms of a CBA or (2) the claim Mr. Burgess asserts was created by the CBA itself. *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212, 216 (6th Cir. 1994); *see Allis-Chalmers Corp.*, 471 U.S. at 220 (when resolution of state law claim depends on terms of CBA, the claim must either be treated as § 301 claim or dismissed as preempted by federal labor-contract law); *Mattis v. Massman*, 355 F.3d 902, 905 (6th Cir. 2004) (state law claims are preempted by the LMRA when the claims are "inextricably intertwined" with terms of the labor contract).

Ford argues that Mr. Burgess relied on terms of the CBAs that were in effect between Ford and the UAW and that the jury was required to analyze and interpret the terms of the CBAs to find in his favor. We disagree. First, it is clear from the jury verdict form and the jury instructions that consideration of the terms of the CBA was not necessary for the jury to consider each of the elements of promissory estoppel. The jury did not consider, much less interpret the CBA, nor was it required to.

Second, Mr. Burgess did not seek to adjudicate or enforce any rights created by a CBA. The basis for Mr. Burgess's promissory estoppel claim was the e-mail Mr. Emery sent to Mr. Rourke and Mr. Decker on June 7, 2000. His claim was not based on any terms of the CBA. The e-mail stated that "Mr. Burgess does not have any contractual right to return to the hourly rolls."[4] The issue of whether the CBA gave Mr. Burgess any rights relevant to this case was not before the jury and was not relevant to his claim for promissory estoppel. Mr. Burgess did testify about the CBA and the protections it offered him when he was an hourly employee. However, he also testified that as a management employee he did not enjoy rights provided by the CBA. Obviously, this testimony goes to elements of the promissory estoppel argument. Ford does not dispute the basic premise.

Mr. Emery also answered questions directed to him about the CBA. He testified that under the terms of the CBA Mr. Burgess accrued seniority with Ford while he worked as an

---

[4]Ford's argument is based in large part on the fact that Mr. Burgess and some of his witnesses testified about the CBA. Mr. Burgess did testify about his understanding of the CBA regarding return to hourly position from management. For example, Mr. Burgess explained on cross-examination that he believed the CBA entitled him to return to an hourly position within six months of moving into a management position or if his position were abolished.

hourly employee, and that if he returned to Ford as an hourly employee, Mr. Burgess would be able to take advantage of that accrued seniority. However, this testimony regarding the CBA's operation in certain circumstances, and its existence as background for the conduct herein, does not turn Mr. Burgess's promissory estoppel claim into a claim brought under the LMRA.

Ford relies on several cases to argue Mr. Burgess's claim is preempted by § 301 of the LMRA. In *Jones v. General Motors Corp.*, the plaintiff alleged his employer breached a settlement agreement. 939 F.2d 380, 382 (6th Cir. 1991). The settlement agreement was reached as a result of a grievance procedure established by a CBA and promised the plaintiff he would be reinstated to a position whose terms and conditions were created by and subject to a CBA. *Id.* The Court explained that although a resolution of the plaintiff's claim would not require a direct interpretation of a precise term of the CBA, it would require a court to address relationships created through the collective bargaining process and to mediate a dispute based on rights created by a CBA. Thus, the court determined the plaintiff's claim required an interpretation of the terms of a CBA and was therefore preempted by § 301 of the LMRA. *Id.* at 382-83.

Ford contends that § 301 preemption applies when a state-based claim requires examining the practices and customs of a workplace whose conditions are governed by a CBA. Ford relies on *Jones* for this contention, which in turn cited the case, *Ulrich v. Goodyear Tire & Rubber Co.*, 884 F.2d 936 (6th Cir. 1989). *Jones*, 939 F.2d at 383. The plaintiffs in *Ulrich* were former bargaining unit employees who transferred into non-bargaining unit jobs. 884 F.2d at 937. When their employer Goodyear entered into negotiations to sell the subsidiary where the plaintiffs worked, the plaintiffs attempted to maintain their positions with Goodyear by returning to the bargaining unit. *Id.* Relying on a provision of the CBA, these employees asked Goodyear to transfer them back to positions in the bargaining unit. The plaintiffs contended it was common practice for employees to go back and forth between positions covered by the bargaining unit and salaried positions. *Id.*

Goodyear refused the employees' requests to return them to the bargaining unit, and the employees filed a grievance with the union. *Id.* When the union refused to process the employees' grievance, the employees filed suit against Goodyear. *Id.* The trial court declined to exercise jurisdiction over the state law claims because the CBA "did not create or grant the right to return to a bargaining unit position." *Id.* at 937. Goodyear appealed, arguing that the employees' promissory estoppel and contract claims were preempted by §301 of the LMRA. The Sixth Circuit agreed and reasoned as follows:

> Plaintiffs' request for return to the bargaining unit and for seniority rights upon
> return depends on rights created by the CBA. The allegedly "common

practice" of allowing free transfer to and from the bargaining unit on which plaintiffs rely relates to the manner in which the CBA was enforced and the practices and customs of the workplace. Broadly speaking, the question depends upon interpretation of the CBA. The decision of the District Court on plaintiffs' separate "state law" claims turned on a determination that the language of the CBA itself did not create an automatic right to return to the bargaining unit. The existence of the plaintiffs' so-called "state law claim" is inextricably intertwined with the CBA. It depends on the practices of the workplace under the CBA.

*Id.* at 938.

As the *Ulrich* Court said, the plaintiffs' claims were based on rights create by the CBA, the manner in which the CBA was enforced and applied, the state law claims and the LMRA claims were "inextricably intertwined," and the question depended "upon the interpretation of the CBA." None of those factors is present here. Mr. Burgess's promissory estoppel claim neither implicates the CBA nor requires an interpretation of any of its provisions. Mr. Burgess does not assert that the CBA or past practices under the CBA gave him a right to return in 2005 to an hourly position. His claim is based instead on the promise expressed in Mr. Emery's e-mail dated June 7, 2000. By its own language, that e-mail recognizes that the promise was unrelated to the CBA.

Other cases relied upon by Ford include *McEwen v. Brown Shoe Co. at Trenton*, 1996 WL 515442 (Tenn. Ct. App. Sept. 12, 1996), wherein the plaintiff alleged his employer breached a CBA by failing to comply with particular provisions regarding notice. *Id*. at *3. The *McEwen* court wrote that "the essence of his suit results in the conclusion that §301 preemption cannot be avoided." *Id.*

Ford also cites *Alley v. Quebecor World Kingsport*, 182 S.W.3d 300 (Tenn. Ct. App. 2005), in support of its preemption argument. The plaintiffs in *Alley* alleged their employer was liable for intentional misrepresentation, fraud, and promissory estoppel based on a notice the employer published representing that the plant where the plaintiffs worked would be closed by a certain date, when in fact the plant remained open for at least an additional ten months. *Id*. at 301-02. An integral part of the plaintiffs' claim was that they were damaged because they relinquished their recall rights for a pittance of their value. *Id*. at 304. To establish the validity of their claims, it was necessary to look at the terms of the CBA to determine what recall rights the plaintiffs had, what their value was, and whether the plaintiffs suffered damages as a result of the employer's actions. *Id.* Because proof of the plaintiffs' claims required interpretation of the CBA's terms, and because the rights the plaintiffs claimed to have lost arose from the CBA itself, the *Alley* court held the plaintiffs'

claims were preempted by § 301 of the LMRA.  *Id.* at 305.

Ford points out that when analyzing preemption, the court must look to the essence of a plaintiff's claim to determine whether the plaintiff is trying to disguise what is essentially a contract claim as a tort.  In support of this statement, Ford cites *DeCoe v. Gen. Motors Corp.*, 32 F.3d 212 (6th Cir. 1994).  The plaintiff in *DeCoe* was the district committeeman for the UAW at a plant in Michigan.  *Id.* at 214.  He filed a complaint against his former employer and several former co-employees alleging slander, tortious interference with economic relations, conspiracy, and intentional infliction of emotional distress.  Despite the plaintiff's characterization of his claims, the *DeCoe* court determined that the essence of the plaintiff's complaint was that the defendants exceeded the scope of CBA-imposed rights and duties in their attempts to prosecute sexual harassment allegations, and  concluded that the plaintiff's claims were preempted by § 301.  *Id.* at 216. The *DeCoe* court made clear, however, that "neither a tangential relationship to the CBA, nor the defendant's assertion of the contract as an affirmative defense will turn an otherwise independent claim into a claim dependent on the labor contract."  32 F.3d at 216 (citing *Fox v. Parker Hannifin Corp.*, 914 F.2d 795, 800 (6th Cir. 1990)).

State law claims are not preempted by the LMRA if they are independent of the CBA. *Mattis v. Massman,* 355 F.3d at 905-06; *see Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 411 (1988) (state courts are permitted to hear state law claims involving labor management relations if claims do not require interpreting CBA itself).  The plaintiff in *Mattis* alleged interference with a business relationship that was created by the CBA as one of his causes of action.  To determine whether or not the defendant interfered with the plaintiff's relationship, the court was required to determine what the rights and responsibilities of the plant supervisors were under the CBA, thus requiring preemption of the state law claims. *Id.*

None of the situations described in these cases exists here.  Mr. Burgess's promissory estoppel claim, the only claim tried before the jury, is based upon the promise reflected in the e-mail.  That promise was expressly unrelated to and independent of the CBA, stating that Mr. Burgess does not have a contractual right to return to Ford's hourly rolls.  To find the existence of the elements of promissory estoppel, the jury was not required to take the CBA into consideration.

We hold that Mr. Burgess's promissory estoppel claim is not pre-empted by § 301 of the LMRA and affirm the trial court's denial of Ford's motion for directed verdict on that issue.

## IV. PROMISSORY ESTOPPEL

In its second argument, Ford argues the evidence in support of Mr. Burgess's claim for promissory estoppel was insufficient as a matter of law. Ford asserts that the trial court erred in allowing the jury verdict to stand in the absence of material evidence in support of the claim and, therefore, the directed verdict should have been granted.

As Mr. Burgess points out in his brief, the jury was given instructions on the elements of promissory estoppel, including apparent authority, and Ford does not challenge or object to any instruction. Additionally, the jury completed a verdict form on which it addressed specific elements and made specific findings. Therefore, the standard of review applicable to jury verdicts applies.

The standard to be applied to a jury's findings of facts is well settled. A jury verdict "shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d). Discussing the "material evidence" standard, the Supreme Court has explained:

> In determining whether there is material evidence to support a verdict, we shall: "(1) take the strongest legitimate view of all the evidence in favor of the verdict; (2) assume the truth of all evidence that supports the verdict; (3) allow all reasonable inferences to sustain the verdict; and (4) discard all [countervailing] evidence." *Barnes v. Goodyear Tire & Rubber Co.*, 48 S.W.3d 698, 704 (Tenn. 2000) (citing *Crabtree Masonry Co. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978)). "Appellate courts shall neither reweigh the evidence nor decide where the preponderance of the evidence lies." *Barnes*, 48 S.W.3d at 704. If there is any material evidence to support the verdict, we must affirm it; otherwise, the parties would be deprived of their constitutional right to trial by jury. *Crabtree Masonry Co.*, 575 S.W.2d at 5.

*Creech v. Addington*, 281 S.W.3d 363, 372 (Tenn. 2009). This is the standard of review we will apply to Mr. Burgess's establishment of the elements of promissory estoppel.

Promissory estoppel is based on "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance . . . ." *Barnes & Robinson Co. v. OneSource Facility Services,* 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006) (quoting *Calabro v. Calabro*, 15 S.W.3d 873, 878 (Tenn. Ct. App. 1999) (itself citing *Amacher v. Brown–Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991)). Under the doctrine, the action or inaction of the promisee in reliance on the promise is a substitute for consideration. *Wilson v. Price*, 195 S.W.3d 661, 670 (Tenn. App. Ct. 2001). Such a promise is enforceable "if injustice can be

avoided only by enforcement of the promise."  *Barnes & Robinson*, 195 S.W.3d at 645.

> The proponent of a claim for promissory estoppel must establish the following:
>
> (1) the detriment suffered in reliance must be substantial in an economic sense;
> (2) the substantial loss to the promisee in acting in reliance must have been
> foreseeable by the promisor; (3) the promisee must have acted reasonably in
> justifiable reliance on the promise as made.

*Calabro*, 15 S.W.3d at 879 (quoting *Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn. 1982)
(itself citing L. SIMPSON, LAW OF CONTRACTS § 61 (2d ed. 1965))).  The promise that
is the basis for the claim must be "unambiguous and not unenforceably vague."  *Calabro*, 15
S.W.3d at 879 (citing *Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. App.
Ct. 1991)).  Promissory estoppel is an equitable doctrine, and "its limits are defined by equity
and reason."  *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 404 (Tenn. Ct. App.
2007).

### A.  Mr. Emery's Authority to Bind Ford

Ford first argues that Mr. Burgess did not establish that Mr. Emery had authority to
bind Ford when Mr. Emery told Mr. Burgess he would be able to return to Ford as an hourly
employee.  Ford asserts that it took no action that gave Mr. Emery the actual or apparent
authority to require Ford to rehire Burgess at an indefinite future time.

An agent's authority consists of his actual authority, express or implied, along with
the apparent authority the principal clothes him with.  *Milliken Group v. Hays Nissan,*  86
S.W.3d 564, 567 (Tenn. Ct. App. 2001) (citing 2A C.J.S. Agency § 146 (1972)).  Apparent
authority has been defined as:

> that authority which a principal holds his agent out as possessing or permits
> him to exercise or to represent himself as possessing, under such
> circumstances as to estop the principal from denying its existence.  Apparent
> authority must be established through the acts of the principal, rather than
> those of the agent.  Apparent authority is found where the principal, by his own
> acts or conduct, has clothed the agent with the appearance of authority.
> Having cloaked the agent with authority, the principal is accordingly estopped
> from denying liability for the acts of an agent acting within that authority.

*Milliken Group*, 86 S.W.3d at 569 (citing *Bells Banking Co. v. Jackson Centre Inc.*, 938
S.W.2d 421, 424-425 (Tenn. Ct. App.1996); *Southern Ry. Co. v. Pickle*, 197 S.W. 675, 677

-12-

(Tenn. 1917); and 2A C.J.S. Agency § 157(a) (1972)).

To prove apparent authority, a plaintiff must prove that "(1) the principal actually or negligently acquiesced in [the agent's] exercise of authority; (2) the third person had knowledge of the facts and a good faith belief that the apparent agent possessed such authority; and (3) the third person relied on this apparent authority to his or her detriment." *Milliken Group*, 86 S.W.3d at 569-70 (quoting *White v. Methodist Hosp. S.*, 844 S.W.2d 642, 646 (Tenn. Ct. App. 1992)). As the Tennessee Supreme Court explained nearly one hundred years ago,

> The apparent power of an agent is to be determined by the acts of the principal and not by the acts of the agent; a principal is responsible for the acts of an agent within his apparent authority only where the principal himself by his acts or conduct has clothed the agent with the appearance of authority, and not where the agent's own conduct has created the apparent authority. The liability of the principal is determined in any particular case, however, not merely by what was the apparent authority of the agent, but by what authority the third person, exercising reasonable care and prudence, was justified in believing that the principal had by his acts under the circumstances conferred upon his agent.

*Southern Ry. Co. v. Pickle*, 197 S.W. 675, 677 (Tenn. 1917).

The jury specifically found, after thorough instruction, that Mr. Burgess had "carried his burden of proving that the person making the alleged promise had the authority to make the promise on behalf of Ford Motor Company at the time of the alleged promise." Consequently, the question before us is whether there is any material evidence in the record to support that finding.

The promissory estoppel claim is based upon Mr. Emery's assurances, specifically the e-mail of June 7, 2000. Ford contends Mr. Emery was a Visteon employee by that date and was therefore no longer an agent of Ford. Both Mr. Emery and Mr. Burgess testified they believed they were still employed by Ford at the time of the e-mail on June 7. Both believed the Visteon spinoff was not going to take place until June 28, which was three weeks after Mr. Emery sent the e-mail at issue.

Mr. Burgess testified that Mr. Emery was his "direct point of contact with upper management," and that Mr. Emery seemed to be the most appropriate person to ask about returning to the hourly rolls at Ford in June 2000, before he believed the spinoff was to occur. Mr. Burgess testified that he believed Mr. Emery was speaking for upper management of Ford and Visteon on June 7. He also testified that Mr. Rourke, the plant manager at the

time, told Mr. Burgess he would get answers to his questions about returning to Ford's hourly workforce after the spinoff, while asking him to stay in his management position.

Mr. Emery told Mr. Burgess he had gotten answers for him. Mr. Emery testified that the answers had come from individuals working for Ford at the corporate level in Dearborn, Michigan. The e-mail itself stated that clarification had come from "appropriate parties at the national level." Mr. Burgess testified that Mr. Emery told him he had checked with the appropriate parties at the national level in Ford Motor Company and Visteon.

It is undisputed that after the Visteon spinoff, the Plant's managers, who were then Visteon employees, were in charge of supervising Ford's hourly employees working at the Plant. Mr. Burgess testified that some of his colleagues had transferred back to Ford hourly employee positions before he made his request but after the spinoff was announced.

Additionally, Mr. Emery assisted another manager to return to an hourly position with Ford. Dan Carmack was a management level employee who started off working for Ford as an hourly employee. By the time of the Visteon spinoff, Mr. Carmack was working for Ford as a manager. After the spinoff, Mr. Carmack became a management employee of Visteon, just like Mr. Burgess. At some point in 2001 Visteon informed Mr. Carmack that his position was being eliminated, and Mr. Carmack testified that Mr. Emery offered him the opportunity to return to his hourly position with Ford. Mr. Carmack testified that Mr. Emery presented him with a document entitled "Visteon Separation Program, Opportunity to Transfer Back to Hourly Status at Your Previous Location," and that Mr. Carmack communicated with Mr. Emery, who was a Visteon employee, about this opportunity to return to Ford's hourly rolls.

In addition to Mr. Carmack, two other individuals who started out as Ford hourly employees and were later promoted to Ford managers testified about their interactions with Mr. Emery after the Visteon spinoff when they decided they wanted to return to Ford as hourly employees. Joseph DiPasquale testified Mr. Emery told him there was a "freeze or hold on any salaried employees returning to hourly." Visteon did not have any hourly employees at the Plant, so Mr. Emery must have been speaking for Ford when making this representation to Mr. DiPasquale. Dennis Honeycutt testified that his supervisory position at Visteon was terminated in 2001 and that Mr. Emery provided him with paperwork to facilitate his transfer back to Ford to work as an hourly employee.

Finally, John Kimbro testified that he was a union representative who helped negotiate CBAs between Ford and its hourly employees who were in the UAW. Mr. Kimbro negotiated on behalf of Ford's hourly employees, and he testified that the Visteon management employees were the ones responsible for negotiating terms of the CBAs on

behalf of Ford. Mr. Kimbro also testified that when Ford hourly employees had grievances against Ford, the Visteon-employed managers, who had formerly been Ford-employed managers, were the ones responsible for representing Ford's interests.

We conclude that Mr. Burgess presented material evidence to support the jury's finding that Mr. Emery had the authority to make the promise on behalf of Ford.

### B. Definiteness of Mr. Emery's Promise

Next, Ford asserts that Mr. Emery's alleged promise to Mr. Burgess was ambiguous and unenforceably vague; Ford characterizes that promise as assuring "an open-ended and indefinite right to return to the hourly rolls at Ford." The promise at the heart of a promissory estoppel claim must, of course, be definite enough to be enforced.

Both Mr. Burgess and Mr. Emery testified that the promise, evidenced in part by the June 7, 2000, e-mail, was that if Mr. Burgess would continue in his position in management after the Visteon spinoff, he could return to an hourly employee position with Ford at the plant when he wanted to. At trial, Mr. Emery testified that his promise was intended to last until any third company, not just Pilkington, purchased the Plant. Mr. Burgess understood Mr. Emery's promise to extend only until such time as a third company bought the Plant, whether it was Pilkington or a different company.[5] Mr. Emery testified that the assurance he provided Mr. Burgess was "good only until a company like Pilkington or some other company came into the picture." There had been discussion of sales of the plant earlier, and in June 2000 there were rumors that Pilkington was going to buy it. Mr. Burgess and other managers had concerns about their job security and benefits if there was a sale.

The trial court instructed the jury that Ford's promise had to be clear, definite, and not vague to be enforceable. After being so instructed, the jury answered Yes to the question, "Do you find that Mr. Burgess has carried his burden of proving that in June 2000 he was made a clear and definite promise that he could return to the position of a Ford Motor Company hourly bargaining unit employee?"

Ford relies on several cases to support its argument that Mr. Emery's promise was unenforceably vague. We find the promises made in those cases are dissimilar to the promise the jury found to have been made herein. In *Amacher v. Brown-Forman Corp.*, 826 S.W.2d

---

[5]Mr. Burgess testified that he told Mr. Emery and Mr. Rourke that "I didn't care whether it was Pilkington or anyone. Any third company I did not want to - - I didn't want to start my career over again. I wanted to stay with Ford Motor Company."

480 (Tenn. Ct. App. 1991), the promise alleged to have been made regarding sale of stillage lacked a quantity, price, and duration, and could not support a claim for promissory estoppel because it was unenforceably vague. *Id.* at 482. The *Amacher* court explained that "[w]ithout these essential terms the court cannot determine whether any injustice will occur from the distillery's decision to curtail its production and alter the way it treats its stillage." *Id.*

Ford also relies on the case *Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398 (Tenn. Ct. App. 2007). In that case, the court described the alleged promise as statements: "[T]he Oak Ridge construction market was strong and solid, that there was years of work to be done, that overtime would be plentiful, and that anyone with a security clearance would have no difficulty finding work in Oak Ridge." The appellate court concluded the representations were too ambiguous, vague, and nonspecific to support a promissory estoppel cause of action. *Id*. at 405-06.

*In re Barton*, 2005 WL 3543223 (Tenn. Ct. App. Dec. 28, 2005), involved a written promise made to induce a woman to move. The letter stated, "Knowing this would be extremely hard for you to do, it would give me a great deal of pleasure to know I helped in some small way. I'm not talking about the short term but the long term, until to (sic) are settled comfortably financially. (However long that takes.)" The appellate court held that "the promise that [the plaintiff] relied upon –that Barton will 'help in some small way' until she was 'settled comfortably financially' can only be characterized as 'unenforceably vague.'" *Id*. at *6.

Mr. Emery's promise was specific as to the action that would be taken and specific as to its duration. We conclude that Mr. Emery's promise was not unenforceably vague or, stated another way, that there was evidence to support the jury's finding that there was a clear and definite promise.

### C. Mr. Burgess's Detrimental Reliance

Ford asserts that Mr. Burgess suffered no detriment when he took no affirmative action in reliance on the alleged promise by Mr. Emery, instead choosing to work continuously in the same position without seeking any other job opportunities. In other words, Ford argues that Mr. Burgess's promissory estoppel claim must fail because he did not prove that he relied on Mr. Emery's promise to his detriment.

An element of promissory estoppel that Mr. Burgess was required to prove was that he acted or refrained from acting in a "definite and substantial" manner based on his reliance on Mr. Emery's promise. *Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn. 1982) (citing

RESTATEMENT OF CONTRACTS, § 90). Whereas a contract requires consideration to be enforceable, promissory estoppel requires detrimental reliance:

> Detrimental action or forbearance by the promisee in reliance on a gratuitous promise, within limits constitutes a substitute for consideration, or a sufficient reason for enforcement of the promise without consideration. This doctrine is known as promissory estoppel. A promisor who induces substantial change of position by the promisee in reliance on the promise is estopped to deny its enforceability as lacking consideration. . . . No injustice results in refusal to enforce a gratuitous promise where the loss suffered in reliance is negligible, nor where the promissee's action in reliance was unreasonable or unjustified by the promise.

*Alden*, 637 S.W.2d at 864 (quoting L. Simpson, *Law of Contracts* §61 (2d ed. 1965)). The detriment suffered must be substantial in an economic sense. *Calabro*, 15 S.W.3d at 879 (quoting *Alden*, 637 S.W.2d at 864 (further citation omitted)).

The jury found Mr. Burgess carried his burden of proving that Mr. Emery's promise caused him "to make a substantial change in position in reliance on the promise." The evidence supports a conclusion that Mr. Burgess forbore from taking an action he had the right to take in reliance on the promise. He agreed to remain as a management employee after the Visteon spinoff instead of insisting on returning to an hourly paid position. The highest ranking official at the Plant specifically asked him to stay in his position instead of returning to an hourly position. Other managers had already transferred back to hourly positions, and there was no indication that Mr. Burgess would not have been able to similarly transfer. In fact, there was evidence that he would have been able to return to his former position at the time of his initial request.

It is true that Mr. Burgess continued to work as a manager at the Plant from the time Mr. Emery made the promise at issue to the time Mr. Burgess asked to move to Ford's hourly rolls. When the case was tried, Mr. Burgess was still working at the Plant in the same position he had held for years. While Ford is correct that Mr. Burgess did not suffer a loss of work as a result of relying on Mr. Emery's promise, that alone does not show that he did not suffer substantial detriment.

Mr. Burgess testified at trial that he wanted to continue working for Ford rather than become an employee of another company because of the benefits and job security Ford provided. There was material evidence from others that these attributes of an hourly position covered by the CBA were considered to have value. Other managers did transfer back to hourly positions instead of working for Visteon simply because they wanted to secure the

-17-

protections and benefits that such positions provided.

Because he complied with Mr. Rourke's request to stay where he was during the transition, Mr. Burgess was not able to participate in the 2006 special early retirement plan offered to all Ford hourly employees. At the time of trial the present day value of the special retirement plan was $748,541. There can be no doubt that this amount is substantial in economic terms.

We find there was material evidence to support the jury's verdict on this issue.

### D. Mr. Burgess's Reasonable Reliance

Ford argues that any reliance by Mr. Burgess on the promise in the e-mail was simply unreasonable. "If reasonable minds could justifiably reach different conclusions based on the evidence at hand, then a genuine question of fact exists." *Heggs v. Wilson Inn Nashville-Elm Hill*, 2005 WL 2051287, at *2 (Tenn. Ct. App. Aug. 25, 2005) (citing *Louis Dreyfus Corp. v. Austin Co.*, 868 S.W.2d 31, 35 (Tenn. Ct. App. 1993)). In this case, the jury found Mr. Burgess satisfied his burden of proving he reasonably relied on the promise. Unless Mr. Burgess introduced no material evidence to support the jury's verdict on this issue, we must affirm.

At trial Mr. Burgess offered the testimony of four former colleagues who started out working for Ford as hourly employees, were promoted to management, and then transferred back to their hourly positions with Ford. Two of Mr. Burgess's former colleagues returned to their hourly positions before the Visteon spinoff, and two transferred after the spinoff. In each instance, the former colleagues testified that Mr. Emery, an administrator in his department, or else his predecessor was their contact and was the person who assisted them in their attempts to transfer back to their former status as hourly employees.

For the reasons stated earlier regarding the authority of Mr. Emery, and based upon the evidence discussed herein, there was clearly a basis for the jury to conclude that Mr. Burgess's reliance on the promise, when it was made and he elected to stay in his position at management's request, was reasonable.

Ford appears to be arguing that it was not reasonable for Mr. Burgess to continue to rely on that promise, stating, "It was not reasonable for Burgess to believe that he could return to Ford at any future time, even five years after the promise was made, after Emery had retired, and after the sale of the Nashville Glass Plant to Pilkington that was the impetus for Burgess's concerns failed to materialize."

Some of the issues raised in that statement have been resolved adversely to Ford in other sections of this opinion. In addition, Ford has not established what event (or nonevent) or the expiration of what period of time converted Mr. Burgess's reasonable reliance into an unreasonable one. The promise, by its terms, was to remain enforceable until another company bought the Plant. Ford seems to argue that he was unreasonable to believe that his longtime employer, a national company who remained in existence, would honor the promise.

Mr. Emery testified that after the spinoff, the managers employed by Visteon to supervise Ford's hourly employees whose positions were later terminated were instructed to notify Mr. Emery if they wanted to transfer back to Ford as hourly employees. These individuals' moves back to hourly positions with Ford following the spinoff, after working as managers for Visteon, supported Mr. Burgess's reasonableness in continuing to believe he would be able to return to his hourly position with Ford.

We conclude that Mr. Burgess presented material evidence to support the jury's finding that Mr. Burgess was reasonable in believing he could rely on Mr. Emery's promise until another company bought the Plant, even if that occurred five years after the promise was made.

### E. The Reasonable Foreseeability of Mr. Burgess's Reliance

Ford's final challenge to Mr. Burgess's promissory estoppel claim is that Mr. Burgess failed to prove that Mr. Emery, as the promisor, foresaw that Mr. Burgess would suffer a substantial loss as a result of remaining in his management position in reliance on the promise he would be able to return to hourly employment in the future.

However, Ford argues in the specific, stating it was not reasonably foreseeable to Mr. Emery in June 2000 that Burgess would be harmed in November 2006 when Ford would offer a Special Early Retirement package to its hourly union employees that was not available to Visteon management employees, such as Burgess. However, we cannot agree that Mr. Burgess was required to prove Mr. Emery foresaw this exact detriment when the promise was made.

Although it is necessary for Mr. Burgess to prove Mr. Emery could foresee Mr. Burgess would suffer a substantial loss in reliance on his promise, Ford overstates the exact nature of what must be foreseen. Ford relies on *Alden v. Presley*, which requires that the promisor "reasonably expect to induce action or forbearance of a definite and substantial character" by the promisee. 637 S.W.2d at 864 (citing RESTATEMENT OF CONTRACTS, §90). Ford has not cited any cases in which a promissory estoppel claim has been dismissed

because the promisor failed to foresee the precise detriment the promisee would suffer as a result of relying on the promise at issue. We have not found any cases to suggest that conclusion.

Mr. Emery testified that he knew Mr. Burgess wanted to return to Ford's hourly rolls because of the job security as well as the benefits enjoyed by the hourly employees as part of the CBA. Mr. Emery understood that these protections and benefits were something Mr. Burgess was giving up by continuing in his managerial position, in reliance on Mr. Emery's promise. The special early retirement plan Ford offered its hourly employees in 2006 was certainly a benefit of the type Mr. Burgess was seeking when he asked to return to Ford's hourly rolls in June 2000.

The jury in this case found that Mr. Burgess satisfied his burden of proving Mr. Emery should have reasonably expected to induce Mr. Burgess to take action in reliance on his promise or refrain from taking some action in reliance on his promise. The evidence supports this finding.

## V. CONCLUSION

For the reasons stated above, we affirm the judgment of the trial court. Costs of this appeal shall be taxed to Ford Motor Company.

_____
PATRICIA J. COTTRELL, JUDGE